# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

|  |  |
|---|---|
| PAUL GAGNE, derivatively on behalf of FORD MOTOR COMPANY, | Case No.: 2:24-cv-12486 |
| Plaintiff, | |
| v. | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| JAMES D. FARLEY, JR., JOHN T. LAWLER, KIMBERLY A. CASIANO, ALEXANDRA FORD ENGLISH, HENRY FORD III, WILLIAM CLAY FORD, JR., WILLIAM HELMAN IV, WILLIAM E. KENNARD, JOHN C. MAY, BETH E. MOONEY, LYNN VOJVODICH RADAKOVICH, JOHN L. THORNTON, JOHN B. VEIHMEYER, and JOHN S. WEINBERG, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| FORD MOTOR COMPANY, | |
| Nominal Defendant. | |

## **INTRODUCTION**

Plaintiff Paul Gagne ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Ford Motor Company ("Ford" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants James D. Farley, Jr. ("Farley"), John T. Lawler ("Lawler"), Kimberly A. Casiano ("Casiano"), Alexandra Ford English ("English"), Henry Ford III ("H. Ford"), William Clay Ford, Jr. ("W. Ford"), William Helman IV ("Helman"), William E. Kennard ("Kennard"), John C. May ("May"), Beth E. Mooney ("Mooney"), Lynn Vojvodich Radakovich ("Vojvodich Radakovich"), John L. Thornton ("Thornton"), John B. Veihmeyer ("Veihmeyer"), and John S. Weinberg ("Weinberg") (collectively, the "Individual Defendants," and together with Ford, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Ford, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Farley and Lawler for contribution under Section 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among

2

other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Ford, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from April 27, 2022 through July 24, 2024, both dates inclusive (the "Relevant Period").

2.      Ford is an automotive company that develops, manufactures, and sells its line of innovative trucks, SUVs, commercial vehicles, and Lincoln luxury vehicles. Ford's business is divided into three segments: Ford Blue, which provides gas-powered and hybrid vehicles; Ford Model e, which develops electric vehicles; and Ford Pro, which suits vehicles and services towards customer needs.

3.      Unbeknownst to the general public during the Relevant Period, Ford's quality assurance procedures for its vehicles were deficient. As a result, the Company began to have to pay out warranties at a higher rate, resulting in higher warranty costs for the Company. Despite this, the Company's warranty reserves

were not up to date with the quality assurance issues with vehicles, and therefore they were improperly funded. As such, the warranty reserve numbers the Company was reporting on its financial reports with the SEC, and therefore its profitability numbers that were reported to the SEC, were wholly inaccurate.

4.    For example, on April 28, 2022, the Company filed its quarterly report on Form 10-Q for the first quarter of the fiscal year ended December 31, 2022 (the "2022 Fiscal Year") (the "1Q 2022 10-Q"). Regarding any "changes in accrual to pre-existing warranties," the 1Q 2022 10-Q states an "estimate of reasonably possible costs in excess of [the Company's] accruals for material field service actions and customer satisfaction actions" in a "range of up to about $700 million in the aggregate."

5.    The truth began to emerge on July 24, 2024, after the market closed, when the Company issued a press release announcing its results for the second quarter of the fiscal year ended on December 31, 2024 (the "2024 Fiscal Year) (the "2Q 2024 Press Release). The 2Q 2024 Press Release revealed, among other things, that "[p]rofitability was affected by an *increase in warranty reserves*" as well as "*higher warranty costs*."[1] Because of these increases, the 2Q 2024 Press Release announced revised full year guidance for the 2024 Fiscal Year of the Ford Model e segment that "reflect[s] *higher warranty costs than originally planned*."

---

[1] Unless otherwise noted, all emphasis is added.

4

6.      Following the release of the 2Q 2024 Press Release, the truth completely emerged when outlets including *The Associated Press* and *The Washington Post* reported that, in the second quarter of the 2024 Fiscal Year, Ford's warranty and recall costs were $2.3 billion, $800 million greater than the first quarter of the 2024 Fiscal Year, and $700 million greater than the second quarter of the fiscal year ended December 31, 2023 (the "2023 Fiscal Year").

7.      On this news, the price of the Company's common stock fell $2.51 per share, or approximately 18.4%, from a closing price of $13.67 per share on July 24, 2024, to a closing price of $11.16 per share on July 25, 2024.

8.      During the Relevant Period, the Individual Defendants breached their fiduciary duties as officers and directors of the Company by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) Ford's quality assurance procedures for its vehicles have been deficient since the start of the Relevant Period; (2) as such, Ford has begun to experience higher warranty costs; (3) because of this, the Company's warranty reserves are not an accurate predictor of quality issues in vehicles sold by the Company since the start of the Relevant Period; (4) the Company's profitability was

therefore reasonably likely to suffer as a result; (5) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of a new Long Term Incentive Plan (the "2023 LTIP") and Non-Employee Director Stock Plan (the "2024 Stock Plan"); and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

9.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact, while, during the Relevant Period, three of the Individual Defendants sold Company shares at inflated prices for combined total proceeds of approximately $2.4 million.

10.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

11.     In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing Ford to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, between November 2022 and June 2024, approximately 54,780,000 shares of Ford common stock were repurchased, costing the Company *over $727.2 million*. As the Company's stock was actually worth only $11.16 per share, the price at which it was trading when markets closed on July 25, 2024, the Company overpaid for

6

repurchases of its own stock *by over $115.9 million* in total.

12.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

13.     In light of the Individual Defendants' misconduct—which has subjected the Company, its President and Chief Executive Officer ("CEO"), and its Vice Chairman and Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Eastern District of Michigan (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

14.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, the Company's directors' receipt of material benefits from the 2023 LTIP and the 2024 Stock Plan, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action, of the President and CEO's, the Vice Chairman and CFO's, and the Company's liability in the Securities Class Action, their being

beholden to each other, their longstanding business and personal relationships with each other, and of their not being disinterested or independent directors, a majority of the Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Sections 10(b) and 20(a) of the Exchange Act (15. U.S.C. § 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

16.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

18.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains

executive offices in this District, the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and the Company is headquartered in this District.

## PARTIES

### Plaintiff

19.     Plaintiff is a current shareholder of Ford. Plaintiff currently owns Company stock and first purchased Company stock on February 7, 2022, which Plaintiff has continuously owned since then.

### Nominal Defendant Ford

20.     Ford is a Delaware corporation with its principal executive offices at One American Road, Dearborn, Michigan 48126. Ford's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "F."

### Defendant Farley

21.     Defendant Farley has served as the Company's President, CEO and as a director since October 2020. According to the proxy statement that the Company filed with the SEC on March 29, 2024 (the "2024 Proxy Statement"), as of February 1, 2024, Defendant Farley beneficially owned 4,657,831 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 1, 2024 was $12.10, Defendant Farley owned approximately $56.4 million worth of Ford common stock as of that date.

22.     For the 2022 Fiscal Year, Defendant Farley received $20,996,146 in total compensation from the Company. This included $1,700,000 in salary, $15,145,381 in stock awards, $2,754,000 in non-equity incentive plan compensation, and $1,396,765 in all other compensation. For the 2023 Fiscal Year, Defendant Farley received $26,470,033 in total compensation from the Company. This included $1,700,000 in salary, $20,329,795 in stock awards, $2,399,040 in non-equity incentive plan compensation, and $2,041,198 in all other compensation.

23.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Farley made the following sale of Company common stock:

| Date | Number of | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 3/3/2023 | 79,921 | $12.86 | $1,027,863 |

Thus, in total, before the fraud was exposed, he sold 79,921 shares of Company common stock on inside information, for which he received approximately $1.0 million in proceeds. His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

24.     The 2024 Proxy Statement stated the following about Defendant Farley:

> Mr. Farley was elected President and Chief Executive Officer of Ford Motor Company effective October 1, 2020, and in March 2022 took on the additional role of President, Ford Model e. Mr. Farley previously

served as Chief Operating Officer, overseeing all of Ford's global markets and automotive operations including Product Development, Purchasing, Enterprise Product Line Management, Manufacturing & Labor Affairs, Marketing, Sales & Service, and Quality & New Model Launch. He also oversaw Mobility Partnerships and Ford Autonomous Vehicles LLC. Mr. Farley has also served as President of New Businesses, Technology and Strategy, leading Ford's strategic transformation into a higher growth, higher margin business by leveraging smart, connected vehicles and breakthrough customer experiences. As Ford's Executive Vice President and President of Global Markets, Mr. Farley was responsible for overseeing Ford's business units around the world, the Lincoln Motor Company, Global Marketing & Sales, and the strategy and business model development for electrified vehicles. From 2015 to 2017, Mr. Farley served as Executive Vice President and President, Ford Europe, Middle East and Africa. Mr. Farley has also served as Executive Vice President of Global Marketing, Sales & Service, and Group Vice President, Global Marketing and Canada, Mexico and South America. Before joining Ford in November 2007, Mr. Farley held various leadership positions at Toyota over a 17-year career. Mr. Farley also serves on the board of directors of the U.S.-China Business Council, is a member of The Business Council, and is co-chair of the Coalition for Reimagined Mobility.

As CEO, Mr. Farley is focused on transforming Ford to lead the digital and electric revolution in the automotive industry through the deployment of the ambitious, customer-focused Ford+ plan. The plan includes a focus on innovation and delivery of breakthrough EVs at scale, along with development of software and connected vehicle technologies and services across all Ford and Lincoln vehicles. Ford benefits from his broad experience across the business and deep knowledge of the auto industry. His successes in other areas of the business exhibit his ability to lead the Company and refocus on key growth areas like autonomous and electric technologies, as well as commercial vehicles.

**Defendant Lawler**

25.     Defendant Lawler has served as the Company's CFO since October

2020 and was appointed as the Company's Vice Chair on June 3, 2024. According to the 2024 Proxy Statement, as of February 1, 2024, Defendant Lawler beneficially owned 942,741 shares of the Company's common stock, and 75 shares of Ford common stock units.[2] Given that the price per share of the Company's common stock at the close of trading on February 1, 2024 was $12.10, Defendant Lawler owned approximately $11.4 million worth of Ford common stock as of that date.

26.    For the 2022 Fiscal Year, Defendant Lawler received $8,956,211 in total compensation from the Company. This included $1,124,850 in salary, $6,535,903 in stock awards, $1,112,355 in non-equity incentive plan compensation, and $183,103 in all other compensation. For the 2023 Fiscal Year, Defendant Lawler received $10,031,212 in total compensation from the Company. This included $1,187,250 in salary, $5,407,923 in stock awards, $1,414,350 in non-equity incentive plan compensation, $1,883,255 in change in pension value and nonqualified deferred compensation earnings, and $138,434 in all other compensation.

27.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Lawler made the following sale of Company common stock:

---

[2] The 2024 Proxy Statement defines "Ford common stock units" as "common stock units credited under a deferred compensation plan and payable in cash and, in the cases of William Clay Ford, Jr. and John T. Lawler, include stock units under a benefit equalization plan."

| Date | Number of | Avg. Price/Share | Proceeds |
|------|-----------|------------------|----------|
| 3/3/2023 | 29,821 | $13.06 | $389,611 |

Thus, in total, before the fraud was exposed, he sold 29,821 shares of Company common stock on inside information, for which he received approximately $389,611 in proceeds. His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

28.    The Ford Newsroom section of Ford's website states the following about Defendant Lawler:

> John Lawler is vice chair and chief financial officer for Ford. As vice chair, Lawler focuses on building a more resilient global business and enabling profitable growth by providing leadership on strategic choices and partnerships – and liaising with policy leaders around the globe. He's been CFO since October 2020, with overall responsibility for Ford's Finance functions, including Accounting, Financial Planning and Analysis, Treasury, Tax, Investor Relations, Economics, and Audit, as well as the Ford Credit business.
>
> Before becoming CFO, Lawler was chief executive officer of Ford Autonomous Vehicles and vice president, Mobility Partnerships, where he led the team developing driverless transportation services. Prior to that, Lawler was vice president, Strategy, overseeing Corporate Strategy, Business Development and Global Data Insights and Analytics.
>
> Earlier, Lawler served as vice president and corporate controller and chief financial officer, Global Markets, from 2016 to 2018. He also held roles throughout Ford's global enterprise, including chairman and chief executive officer of Ford China, and CFO for Ford Asia Pacific and Africa, based in Shanghai.
>
> Since joining Ford in 1990, Lawler's assignments have also included

controller of Ford of Europe's Product Development organization and finance leadership with Mazda in Japan. Later, Lawler was a key member of the team that led the company's turnaround in North America from 2007 to 2010 as controller of U.S. Marketing and Sales.

Lawler earned a bachelor's degree in economics from Knox College in 1988 and a master's degree in business administration from the University of Iowa in 1990. He and his wife, Inga, have three children.

### **Defendant Casiano**

29.    Defendant Casiano has served as a director since 2003. She is also a member of the Audit Committee, the Nominating and Governance Committee, and the Sustainability, Innovation and Policy Committee. According to the 2024 Proxy Statement, as of February 1, 2024, Defendant Casiano beneficially owned 233,603 shares of the Company's common stock, and 183,823 shares of Ford common stock units. Given that the price per share of the Company's common stock at the close of trading on February 1, 2024 was $12.10, Defendant Casiano owned approximately $2.8 million worth of Ford common stock as of that date.

30.    For the 2022 Fiscal Year, Defendant Casiano received $350,345 in total compensation from the Company. This included $100,000 in fees earned or paid in cash, $214,993 in stock awards, and $35,352 in all other compensation. For the 2023 Fiscal Year, Defendant Casiano received $331,441 in total compensation from the Company. This included $100,000 in fees earned or paid in cash, $214,991 in stock awards, and $16,450 in all other compensation.

31.    The 2024 Proxy Statement stated the following about Defendant

Casiano:

> Ms. Casiano has been the President of Kimberly Casiano & Associates since 2010. Her firm provides advisory services in marketing, recruiting, communications, advocacy, and diversity. From 1994 through 2009, Ms. Casiano served as President and Chief Operating Officer of Casiano Communications, Inc., a U.S. Hispanic media and direct marketing company. She joined the company in 1987 and held various management positions. Prior to that, Ms. Casiano was a consultant in the Caribbean and Latin America for the U.S. Agency for International Development (A.I.D.) of the U.S. Department of State, focusing on economic development, trade, and investment promotion programs. Ms. Casiano is a member of the founding Board of Directors of the Latino Corporate Directors Association, the global Alumni Board of Harvard Business School, and the Board of Advisors of Moffitt Cancer Center in Tampa. Ms. Casiano also serves as a director of Federal Home Loan Bank of Atlanta.

> Ms. Casiano has extensive domestic and international experience in marketing, sales, media, advertising, customer relationship management (CRM), and direct marketing, particularly in U.S. Hispanic and Latin American markets. Ford benefits from Ms. Casiano's global business and executive experience cultivated through years spent managing her own company. Ms. Casiano consistently provides Ford with valuable insight on how to reach and engage customers, enterprise risk management systems, and ESG strategy.

## **Defendant English**

32.     Defendant English has served as a director since 2021. Defendant English served as an employee of Ford between July 2017 and June 2022, most recently serving as Director of Global Brand Merchandising. She is also a member of the Finance Committee and the Sustainability, Innovation and Policy Committee. According to the 2024 Proxy Statement, as of February 1, 2024, Defendant English

beneficially owned 26,860 shares of the Company's common stock, and 1,406,945 shares of the Company's Class B stock.[3] Given that the price per share of the Company's common stock at the close of trading on February 1, 2024 was $12.10, Defendant English owned approximately $325,006 worth of Ford common stock as of that date.

33.    For the 2022 Fiscal Year, Defendant English received $517,924 in total compensation from the Company. This included $50,000 in fees earned or paid in cash, $107,487 in stock awards, and $360,437 in all other compensation. For the 2023 Fiscal Year, Defendant English received $383,710 in total compensation from the Company. This included $314,990 in stock awards, and $68,720 in all other compensation.

34.    The 2024 Proxy Statement stated the following about Defendant English:

> From July 2017 to June 2022, Ms. English was an employee of Ford Motor Company, most recently serving as a Director of Global Brand Merchandising, responsible for driving a growth strategy that leveraged Ford's storied brand, iconic vehicles, and motor sports success to create an expanded collection of lifestyle merchandise. Previously, Ms. English was a Director of Corporate Strategy, responsible for the Company's enterprise strategy, capital allocation strategic process, and connectivity, tech stack, and software strategies. Before joining the strategy team, Ms. English was the Director of Markets and Operations

---

[3] Class B stock is stock that is held in trust by members of the Ford family. As such, the stock is not publicly traded. While Class B stock consists of 36-votes per share as opposed to one vote per share of common stock, the Class B shares only account for 40% of the Company's overall voting power. Further, Class B shareholders do not have the right to elect any directors separately from common shareholders.

for Ford Autonomous Vehicles LLC (now Ford Next LLC), which was charged with developing and bringing to market driverless transportation services. Ms. English brought her expertise in operating businesses to the autonomous vehicle team and was responsible for the successful deployment and operations of Ford's autonomous vehicle business in Miami, Austin, and Washington, D.C. Previously, Ms. English was part of Ford Smart Mobility's City Solutions team, responsible for working with cities to understand how mobility services could be successfully developed and deployed. Prior to joining Ford Motor Company, Ms. English ran merchandising divisions at Tory Burch in New York City and at Gap, Inc. in San Francisco. Ms. English previously served on the board of Rivian. She earned a bachelor's degree from Stanford University and an MBA from Harvard Business School.

Ms. English's merchandising and retailing experience enables her to provide valuable insights into successful brand management and building trusted relationships with our customers. Ms. English's experience and leadership in corporate strategy provide an important perspective to the Board during the Company's transformation and her knowledge of autonomous vehicle operations allows her to offer valuable advice as the Company expands its mobility business. Additionally, Ford family members have a special interest in the continuing success of the Company and have always played an important role in the business. Ms. English's participation on the Board ensures that tradition of family stewardship continues.

### Defendant H. Ford

35.     Defendant H. Ford has served as a director since 2021. Director H. Ford served as an employee of Ford from February 2006 until June 2021, most recently serving as Director of Investor Relations. He is also a member of the Finance Committee and the Sustainability, Innovation and Policy Committee. According to the 2024 Proxy Statement, as of February 1, 2024, Defendant H. Ford beneficially owned 50,153 shares of the Company's common stock and 1,691,807

of the Company's Class B stock. Given that the price per share of the Company's common stock at the close of trading on February 1, 2024 was $12.10, Defendant H. Ford owned approximately $606,851 worth of Ford common stock as of that date.

36.    For the 2022 Fiscal Year, Defendant H. Ford received $366,981 in total compensation from the Company. This included $100,000 in fees earned or paid in cash, $214,993 in stock awards, and $51,988 in all other compensation. For the 2023 Fiscal Year, Defendant H. Ford received $369,454 in total compensation from the Company. This included $100,000 in fees earned or paid in cash, $214,991 in stock awards, and $54,463 in all other compensation.

37.    The 2024 Proxy Statement stated the following about Defendant H. Ford:

> Mr. Ford serves as an advisor to several early-stage companies and helps develop business plans, growth strategies, and other related matters. Until June 2021, Mr. Ford served as a Director of Investor Relations at Ford Motor Company, responsible for developing and executing a global investor relations strategy. Prior to his Investor Relations role, Mr. Ford served as Associate Director of Ford's Corporate Strategy skill team where he focused on the development of strategic framework deliverables and vehicle portfolio strategies. Prior to that, Mr. Ford was the Global Marketing Manager for Ford Performance where he launched the marketing and sales strategy for the Ford GT. Since joining the Company in February 2006, Mr. Ford held positions of increasing responsibility in labor relations, purchasing, marketing and sales, and corporate strategy. Mr. Ford serves on the advisory boards of Henry Ford College, Bridging Communities, Operation Hope, Southwest Solutions, and Edgewater Funds. He serves on the Board of Trustees of The Henry Ford, Ford Foundation, Neighborhood Villages, and Ford Piquette Avenue Plant. Mr. Ford earned a bachelor's degree from Dartmouth College and an

MBA from Massachusetts Institute of Technology, Sloan School of Management.

Mr. Ford's cross functional experience in labor relations, purchasing, marketing and sales, corporate strategy, and investor relations spanning his 15-year career with Ford provides him with a unique perspective and understanding of Company operations and customer viewpoints. The Board also benefits from Mr. Ford's prior leadership experience on the Ford Investor Relations skill team as the Company continues its focus on value creation. Additionally, Ford family members have a special interest in the continuing success of the Company and have always played an important role in the business. Mr. Ford's participation on the Board ensures that tradition of family stewardship continues.

### **Defendant W. Ford**

38.    Defendant W. Ford has served as a director since 1988 and has served as the Board's Executive Chairman since January 1999. Defendant W. Ford previously served as CEO of the Company from October 2001 until September 2006. He is also the Chair of the Finance Committee and a member of the Sustainability, Innovation and Policy Committee. According to the 2024 Proxy Statement, as of February 1, 2024, Defendant W. Ford beneficially owned 2,949,527 shares of the Company's common stock, 276,200 shares of Ford common stock units, and 19,592,914 shares of Company's Class B stock. Given that the price per share of the Company's common stock at the close of trading on February 1, 2024 was $12.10, Defendant W. Ford owned approximately $35.7 million worth of Ford common stock as of that date.

39.    For the 2022 Fiscal Year, Defendant W. Ford received $17,302,266 in

total compensation from the Company. This included $1,700,000 in salary, $12,847,472 in stock awards, $810,000 in non-equity incentive plan compensation, and $1,944,794 in all other compensation. For the 2023 Fiscal Year, Defendant W. Ford received $20,613,100 in total compensation from the Company. This included $1,700,000 in salary, $15,848,199 in stock awards, $705,600 in non-equity incentive plan compensation, $155,876 in change in pension value and nonqualified deferred compensation earnings, and $2,203,425 in all other compensation.

40.    The 2024 Proxy Statement stated the following about Defendant W. Ford:

> Mr. Ford has served as Chair of the Board of Directors since he was elected to that position in January 1999. He served as Chief Executive Officer of the Company from October 2001 until September 2006 when he was elected Executive Chair. Mr. Ford has held a number of management positions within Ford, including Vice President of the company's Commercial Truck Vehicle Center. Mr. Ford is Chair of the Finance Committee, a position he has held since 2007 and that he also held from 1995 until October 2001. Mr. Ford is also Vice Chair of the Detroit Lions, Inc., former Chair of the Detroit Economic Club, and a member of the Board of Trustees of The Henry Ford. He also is a member of the Board of Business Leaders for Michigan.
>
> Mr. Ford has served in a variety of key roles at Ford and understands the Company and its various stakeholders. His long-term perspective and lifelong commitment to the Company adds significant value to the Company's stakeholder relationships. Mr. Ford, an early and influential advocate for sustainability at the Company, has long been recognized as a leader in advancing mobility, connectivity, and electrification in the automobile industry, which adds significant value to Board deliberations.

**<u>Defendant Helman</u>**

41.     Defendant Helman has served as a director since 2011. He is also the Chair of the Sustainability, Innovation and Policy Committee and a member of the Finance Committee and the Nominating and Governance Committee. According to the 2024 Proxy Statement, as of February 1, 2024, Defendant Helman beneficially owned 239,367 shares of the Company's common stock and 49,067 shares of Ford common stock units. Given that the price per share of the Company's common stock at the close of trading on February 1, 2024 was $12.10, Defendant Helman owned approximately $2.9 million worth of Ford common stock as of that date.

42.     For the 2022 Fiscal Year, Defendant Helman received $339,855 in total compensation from the Company. This included $120,000 in fees earned or paid in cash, $214,993 in stock awards, and $4,861 in all other compensation. For the 2023 Fiscal Year, Defendant Helman received $353,857 in total compensation from the Company. This included $120,000 in fees earned or paid in cash, $214,991 in stock awards, and $18,866 in all other compensation.

43.     The 2024 Proxy Statement stated the following about Defendant Helman:

> Mr. Helman is a General Partner at Greylock Partners, a venture capital investment firm focused on early-stage investments in technology, enterprise software, and consumer internet. He joined Greylock in 1984 and served as Managing Partner from 1999 to 2013. Mr. Helman is on the Board of Trustees of Vornado Realty Trust. He is also a founder and Chairman of the Board of Equal Opportunity Ventures, which backs founders focused on products and services that address income inequality and social mobility.

Mr. Helman's experience with technology investments and social media marketing provides a unique and valued perspective as these issues are becoming increasingly important as the auto industry adopts new technologies, develops innovative solutions to personal mobility challenges, and adapts to new social media techniques. Mr. Helman's expertise in investing in new innovations offers the Board valuable insight as Ford continues to invest in connectivity and mobility technologies in order to deliver innovative products our customers want and value.

**Defendant Kennard**

44.     Defendant Kennard has served as a director since 2015. He is also the Chair of the Nominating and Governance Committee, as well as a member of the Finance Committee and the Sustainability, Innovation and Policy Committee. According to the 2024 Proxy Statement, as of February 1, 2024, Defendant Kennard beneficially owned 210,127 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 1, 2024 was $12.10, Defendant Kennard owned approximately $2.5 million worth of Ford common stock as of that date.

45.     For the 2022 Fiscal Year, Defendant Kennard received $394,772 in total compensation from the Company. This included $120,000 in fees earned or paid in cash, $214,993 in stock awards, and $59,778 in all other compensation. For the 2023 Fiscal Year, Defendant Kennard received $397,947 in total compensation from the Company. This included $120,000 in fees earned or paid in cash, $214,991 in stock awards, and $62,956 in all other compensation.

46.    The 2024 Proxy Statement stated the following about Defendant Kennard:

> Mr. Kennard is a co-founding partner of Astra Capital Management, a private equity firm. Mr. Kennard served as chairman of the U.S. Federal Communications Commission (FCC) from 1997 to 2001 and served as the FCC's general counsel from 1993 to 1997. As U.S. Ambassador to the European Union from 2009 to 2013, he worked to eliminate regulatory barriers to commerce and to promote transatlantic trade, investment, and job creation. In addition to his public service, Mr. Kennard was a managing director of The Carlyle Group from 2001 to 2009 where he led investments in the telecommunications and media sectors. He also serves as a trustee of Yale University.
>
> Mr. Kennard has extensive experience in the public policy, law, telecommunications, and private equity fields. In particular, he has shaped policy and pioneered initiatives to help technology benefit consumers worldwide, and he is regarded as a champion for consumers in the digital age. His significant business expertise, unique perspective, risk management skills, and first-hand knowledge of the technological regulatory landscape help guide our growth strategy, particularly as we accelerate our innovative work and investments in the areas of software and digital services.

**<u>Defendant May</u>**

47.    Defendant May has served as a director since 2021. He is also a member of the Compensation, Talent and Culture Committee and the Nominating and Governance Committee. According to the 2024 Proxy Statement, as of February 1, 2024, Defendant May beneficially owned 56,883 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 1, 2024 was $12.10, Defendant May owned approximately $688,284 worth of Ford common stock as of that date.

48.     For the 2022 Fiscal Year, Defendant May received $317,039 in total compensation from the Company. This included $100,000 in fees earned or paid in cash, $214,993 in stock awards, and $2,046 in all other compensation. For the 2023 Fiscal Year, Defendant May received $348,504 in total compensation from the Company. This included $314,990 in stock awards, and $33,514 in all other compensation.

49.     The 2024 Proxy Statement stated the following about Defendant May:

John C. May has been Chief Executive Officer of Deere & Company ("Deere") since November 2019 and Chairman of Deere's Board of Directors since May 2020. Mr. May is responsible for leading efforts to maximize financial and operational performance and ensure that Deere's global customer base is provided with advanced products and services. Mr. May joined Deere in 1997 as Director, Business Planning and Development after five years as a management consultant at KPMG Peat Marwick. Prior to being appointed Chief Executive Officer of Deere in 2019, Mr. May served as an officer of Deere as Vice President, Agriculture & Turf Global Platform, Turf & Utility (2009-2012), President, Agricultural Solutions & Chief Information Officer (2012-2018), President, Worldwide Agriculture & Turf Division, Global Harvesting and Turf Platforms, Ag Solutions (Americas and Australia (2018-2019)). Earlier roles included Managing Director of Deere's China operations during a period of significant growth (2004-2007) and Director, Vehicles Marketing (2003-2004).

Mr. May has invaluable leadership experience revolutionizing the agriculture and construction industries through the rapid introduction of connectivity and advanced technology. Mr. May's breadth of management experience and expertise in the areas of global operations, information technology, and manufacturing provide valuable insight into these key areas.

**Defendant Mooney**

50.     Defendant Mooney has served as a director since 2019. She is also a member of the Audit Committee and the Nominating and Governance Committee. According to the 2024 Proxy Statement, as of February 1, 2024, Defendant Mooney beneficially owned 115,830 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 1, 2024 was $12.10, Defendant Mooney owned approximately $1.4 million worth of Ford common stock as of that date.

51.     For the 2022 Fiscal Year, Defendant Mooney received $352,138 in total compensation from the Company. This included $100,000 in fees earned or paid in cash, $214,993 in stock awards, and $37,144 in all other compensation. For the 2023 Fiscal Year, Defendant Mooney received $353,342 in total compensation from the Company. This included $100,000 in fees earned or paid in cash, $214,991 in stock awards, and $38,352 in all other compensation.

52.     The 2024 Proxy Statement stated the following about Defendant Mooney:

> Ms. Mooney served as Chairman and Chief Executive Officer of KeyCorp from May 2011 until May 2020. She joined the company in April 2006 as Vice Chair of Key Community Bank, and in 2010 was elected to KeyCorp's board of directors. Previously, Ms. Mooney was Senior Executive Vice President and Chief Financial Officer at Alabama-based AmSouth Bancorporation (now Regions Financial Corp.) and held senior positions at Bank One Corp., Citicorp Real Estate, Inc., Hall Financial Group, and Republic Bank of Texas/First

Republic. Ms. Mooney is a member of the Board of Trustees of the Brookings Institute and a member of the Business Council. In addition, Ms. Mooney is the Chair of the Board of Directors of The Cleveland Clinic and a Trustee of the Board of the Musical Arts Association (The Cleveland Orchestra). She is Past Chair of the Greater Cleveland Partnership, one of the largest Chambers of Commerce in the nation.

Ms. Mooney has a wealth of experience and deep understanding of the financial industry. Her extensive banking and business experience bring a unique perspective that will enhance the Board during this transformational time in the Company and the industry. Additionally, Ms. Mooney's extensive experience in risk management and executive matters will provide Ford with valuable insight into these key areas.

### **Defendant Vojvodich Radakovich**

53.     Defendant Vojvodich Radakovich has served as a director since 2017. She is also the Chair of the Compensation, Talent and Culture Committee, as well as a member of the Nominating and Governance Committee and the Sustainability, Innovation and Policy Committee. According to the 2024 Proxy Statement, as of February 1, 2024, Defendant Vojvodich Radakovich beneficially owned 171,531 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 1, 2024 was $12.10, Defendant Vojvodich Radakovich owned approximately $2.1 million worth of Ford common stock as of that date.

54.     For the 2022 Fiscal Year, Defendant Vojvodich Radakovich received $406,964 in total compensation from the Company. This included $114,583 in fees earned or paid in cash, $214,993 in stock awards, and $77,388 in all other

compensation. For the 2023 Fiscal Year, Defendant Vojvodich Radakovich received $420,016 in total compensation from the Company. This included $125,000 in fees earned or paid in cash, $214,991 in stock awards, and $80,025 in all other compensation.

55.    The 2024 Proxy Statement stated the following about Defendant Vojvodich Radakovich:

> Ms. Vojvodich Radakovich is an advisor to start-up and growth-stage technology companies. Previously, Ms. Vojvodich Radakovich was Executive Vice President and Chief Marketing Officer of salesforce.com, Inc. ("Salesforce") from September 2013 until February 2017. In this role, she led Salesforce's branding and positioning, public relations, digital marketing, content marketing, marketing campaigns, and strategic events. Before joining Salesforce, Ms. Vojvodich Radakovich held marketing leadership roles at Microsoft and BEA Systems, and served as a partner with venture capital firm Andreessen Horowitz. She was the founder of Take3, a marketing strategy firm, and is a member of the Board of Figma, a collaborative design platform that helps teams around the world create software.
>
> Ms. Vojvodich Radakovich has a wealth of expertise in marketing technology and innovation, market analysis, and the software industry. As Ford continues to transform itself to lead the digital and electric revolution in the automotive industry, Ms. Vojvodich Radakovich provides valuable guidance regarding how the Company should market and position itself in its automotive and mobility businesses, including the use of digital strategies. Ms. Vojvodich Radakovich's experience advising start-up and growth-stage technology businesses lends itself to the Company as it continues culture-shaping initiatives to attract talent and deliver a broader suite of mobility products and services.

### **Defendant Thornton**

56.    Defendant Thornton has served as a director since 1996, and as Lead

Independent Director since 2022. He is also a member of the Compensation, Talent and Culture Committee, Finance Committee, and the Nominating and Governance Committee. According to the 2024 Proxy Statement, as of February 1, 2024, Defendant Thornton beneficially owned 340,298 shares of the Company's common stock and 380,182 shares of Ford common stock units. Given that the price per share of the Company's common stock at the close of trading on February 1, 2024 was $12.10, Defendant Thornton owned approximately $4.1 million worth of Ford common stock as of that date.

57.    For the 2022 Fiscal Year, Defendant Thornton received $367,473 in total compensation from the Company. This included $129,167 in fees earned or paid in cash, $214,993 in stock awards, and $23,313 in all other compensation. For the 2023 Fiscal Year, Defendant Thornton received $388,960 in total compensation from the Company. This included $150,000 in fees earned or paid in cash, $214,991 in stock awards, and $23,969 in all other compensation.

58.    The 2024 Proxy Statement stated the following about Defendant Thornton:

> Mr. Thornton has served as Chairman of Barrick Gold Corporation since February 2024, following his role as Executive Chairman from April 2014 to February 2024. He also serves as Non-Executive Chairman of PineBridge Investments, a global asset manager, and Chairman of RedBird Capital Partners, a private investment firm. Mr. Thornton serves as lead director on the Boards of Lenovo Group Limited, Divergent Technologies, a digital advanced manufacturing company focused on the automotive and aerospace-defense industries,

and SparkCognition, a leading industrial artificial intelligence company. He is a Professor of Tsinghua University School of Economics and Management in Beijing and serves as the Director of its Global Leadership Program. He is also an Advisory Board member of Tsinghua's School of Economics and Management and its School of Public Policy and Management. Mr. Thornton is Co-Chair of the Asia Society and Chairman Emeritus of the Brookings Institution in Washington, D.C. Mr. Thornton retired as President and Director of The Goldman Sachs Group, Inc. in 2003. His previous roles include Chairman of Goldman Sachs Asia and Co-Chief Executive of Goldman Sachs International, overseeing the firm's business in Europe, the Middle East, and Africa. Mr. Thornton is also on the advisory boards or board of trustees of the China Investment Corporation (CIC), King Abdullah University of Science and Technology, McKinsey Advisory Council, Schwarzman Scholars, and the African Leadership Academy.

Mr. Thornton has extensive international business and financial experience. Mr. Thornton brings valuable insight into emerging markets gained through his oversight of the presence of Goldman Sachs International on multiple continents. Mr. Thornton's extensive experience in finance and business matters, both domestically and internationally, is critical to achieving our fitness goals of financing our long-term strategic plan, improving our balance sheet, and creating profitable growth. Mr. Thornton's unique knowledge brings to the Board valuable insight in international business, especially in China, which has become one of the world's most important automotive growth markets.

### **Defendant Veihmeyer**

59.     Defendant Veihmeyer has served as a director since 2017. He is also the Chair of the Audit Committee and a member of the Nominating and Governance Committee. According to the 2024 Proxy Statement, as of February 1, 2024, Defendant Veihmeyer beneficially owned 216,943 shares of the Company's common stock. Given that the price per share of the Company's common stock at

the close of trading on February 1, 2024 was $12.10, Defendant Veihmeyer owned approximately $3.2 million worth of Ford common stock as of that date.

60.     For the 2022 Fiscal Year, Defendant Veihmeyer received $407,998 in total compensation from the Company. This included $130,000 in fees earned or paid in cash, $214,993 in stock awards, and $63,004 in all other compensation. For the 2023 Fiscal Year, Defendant Veihmeyer received $409,832 in total compensation from the Company. This included $344,998 in stock awards and $64,834 in all other compensation.

61.     The 2024 Proxy Statement stated the following about Defendant Veihmeyer:

> Mr. Veihmeyer served as Chairman of KPMG International from 2014 until his retirement after 40 years with KPMG in September 2017. Before becoming global chairman, Mr. Veihmeyer held numerous leadership roles at KPMG, including U.S. Chairman and Chief Executive Officer from 2010 to 2015, U.S. Deputy Chairman, managing partner of KPMG's Washington, D.C. operations, and global head of Risk Management and Regulatory. Mr. Veihmeyer currently serves as Vice Chair of the Board of Trustees of the University of Notre Dame and will become its Chair effective June 2024. He also serves as Board Chair of both the Ladies Professional Golf Association and Catholic Charities of Washington, D.C. Mr. Veihmeyer previously served as a Trustee of the Financial Accounting Foundation, which oversees the Financial Accounting Standards Board.

> Mr. Veihmeyer has extensive experience in the accounting profession, both in the United States and internationally, as well as executive leadership experience as Chairman and Chief Executive Officer of KPMG. His experience leading KPMG has provided Mr. Veihmeyer with significant exposure to business operations in every region of the world. Mr. Veihmeyer also previously served on the board of Catalyst,

Inc. and has been recognized for his leadership in diversity and inclusion. Mr. Veihmeyer has invaluable financial expertise, executive leadership experience, risk management skills, international exposure, and understanding of complex regulatory environments.

**Defendant Weinberg**

62.     Defendant Weinberg has served as a director since 2016. He is also a member of the Compensation, Talent and Culture Committee, the Nominating and Governance Committee, and the Sustainability, Innovation and Policy Committee. According to the 2024 Proxy Statement, as of February 1, 2024, Defendant Weinberg beneficially owned 261,661 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 1, 2024 was $12.10, Defendant Weinberg owned approximately $3.2 million worth of Ford common stock as of that date.

63.     For the 2022 Fiscal Year, Defendant Weinberg received $350,038 in total compensation from the Company. This included $100,000 in fees earned or paid in cash, $214,993 in stock awards, and $35,045 in all other compensation. For the 2023 Fiscal Year, Defendant Casiano received $350,394 in total compensation from the Company. This included $314,990 in stock awards and $35,404 in all other compensation.

64.     The 2024 Proxy Statement stated the following about Defendant Weinberg:

Mr. Weinberg is Evercore Inc.'s Chief Executive Officer and Chairman

of the Board, a position he has held since February 2022. Mr. Weinberg had been serving as Evercore, Inc.'s Co-Chief Executive Officer and Co-Chairman of the Board of Directors since July 2020. He served as Chairman of the Board of Directors and Executive Chairman of Evercore Inc. beginning in November 2016. Previously, Mr. Weinberg served as Vice Chairman of the Goldman Sachs Group from June 2006 until October 2015. His career at Goldman Sachs spanned more than three decades, with the majority of his time spent in the investment banking division. Mr. Weinberg currently serves as a board member of New York-Presbyterian Hospital and the Cystic Fibrosis Foundation.

Mr. Weinberg has extensive experience in finance, banking, and capital markets, as well as a deep understanding of Ford, its history, and the needs of its business. During his time with Goldman Sachs, Mr. Weinberg served as a trusted advisor to Ford and other individual clients. Mr. Weinberg's financial and risk management expertise will aid the Company in addressing its cost structure, allocating capital, and financing its business plan.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

65.    By reason of their positions as officers, directors, and/or fiduciaries of

Ford and because of their ability to control the business and corporate affairs of Ford,

the Individual Defendants owed Ford and its shareholders fiduciary obligations of

trust, loyalty, good faith, and due care, and were and are required to use their utmost

ability to control and manage Ford in a fair, just, honest, and equitable manner. The

Individual Defendants were and are required to act in furtherance of the best interests

of Ford and its shareholders so as to benefit all shareholders equally.

66.    Each director and officer of the Company owes to Ford and its

shareholders the fiduciary duty to exercise good faith and diligence in the

administration of the Company and in the use and preservation of its property and

assets and the highest obligations of fair dealing.

67.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Ford, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

68.    To discharge their duties, the officers and directors of Ford were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

69.    Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Ford, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of Ford's Board at all relevant times.

70.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

71.     To discharge their duties, the officers and directors of Ford were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Ford were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Michigan, and the United States, and pursuant to Ford's own Code of Conduct (the "Code of

Conduct");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Ford conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Ford and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Ford's operations would comply with all applicable laws and Ford's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information

that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

72.     Each of the Individual Defendants further owed to Ford and the shareholders the duty of loyalty requiring that each favor Ford's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

73.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Ford and were at all times acting within the course and scope of such agency.

74.     Because of their advisory, executive, managerial, directorial, and controlling positions with Ford, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

75.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the

wrongful acts complained of herein, as well as the contents of the various public statements issued by Ford.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

76.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

77.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

78.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and

violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Ford was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

79.   Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

80.   At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Ford, and was at all times acting within the course and scope of such agency.

## FORD'S CODE OF CONDUCT AND GOVERNANCE POLICIES

### *Code of Conduct*

81.   Ford's Code of Conduct states that "[e]veryone at Ford is accountable for following the Code – including colleagues, contractors, People Leaders, senior

management, and the board of directors." Additionally, the Code of Conduct

"provides high-level guidance, including in areas that can carry ethical and legal

risk."

82.     Under the heading "Quality in Our Products and Services," the Code

of Conduct states the following, in relevant part:

> Ford's customers rely on our attention to quality. The strength of our
> brand depends on it. We consult both internal and external standards
> when creating our quality and engineering processes and requirements.
> We actively evaluate quality and aim to deliver continuous
> improvement of our products and services.
>
> As the Ford Team, we:
>
> - Prioritize quality in our products and services, seeking
>   continuous improvement
>
> - Implement and follow disciplined systems to measure
>   performance, enhance consistency, and manage feedback
>
> - Take quality concerns seriously, whether from inside or outside
>   the company, and address them appropriately

83.     Under the heading "Avoiding Conflicts of Interest," the Code of

Conduct states the following, in relevant part:

> A good reputation — both as a company and as individuals — is earned
> through consistently trustworthy behavior. During our work for Ford,
> our activities and efforts should align with the company's goals and
> best interests. We don't put ourselves in situations where our own
> personal interests conflict with those of Ford. We want to avoid even
> the perception of favoritism, preferential treatment, or unfair business
> practices.
>
> As the Ford Team, we:

- Watch for situations where our personal endeavors might be at odds with our responsibilities to Ford — even involving unpaid roles or volunteer positions.

- Identify any potential conflicts, disclose them promptly, and work with the company to resolve any issues.

- Manage work–related relationships responsibly, removing ourselves from any work-related decisions that involve a close friend, family member, or romantic partner. Refer to the Personal Relationships in the Workplace policy for disclosure requirements.

- Disclose any personal or family financial interests in organizations that do business or seek to do business with Ford.

- Get approval before entering into any situation where we may benefit personally from a transaction involving Ford — for instance, buying property, services, or products from a business that is personally owned by us or a family member.

- Get approval before accepting any additional or supplemental employment or positions outside of Ford that may interfere with our job responsibilities or could benefit from confidential information gained during Ford employment.

- Pursue business opportunities appropriately. For example, never take personal advantage of an opportunity we learned about while in a Ford role and which, if known, Ford might want to pursue. If Ford chooses not to pursue it, we are free to pursue the opportunity for our own benefit. If we do pursue it, then we must disclose this outside opportunity to the company as required by this policy to ensure there is no conflict of interest.

84.     Under the heading "Company Assets," the Code of Conduct states the following, in relevant part:

Ford's assets are essential to our company, our work, and our business, and we all play a role in making sure they are used properly. We all must take care with the company's tangible and intangible assets, using them for business purposes and protecting them from loss, theft, and misuse.

As the Ford Team, we:

- Do not take Ford equipment, tools, parts, or other physical assets for personal use.

- Dispose of company assets (equipment, machinery, tooling, facilities, vehicle parts and components) in line with company guidelines, taking care to protect Ford's intellectual property.

- Use Ford's assets properly and protect the confidentiality of our trade secrets and proprietary, confidential and secret information.

- Use Ford-owned devices and systems, networks and programs ("Ford Electronic Assets") appropriately and follow our information security policies to protect our data and information.

- Take business continuity plans seriously and follow them in the event of a disruption.

- Don't take unfair personal advantage of our position, company assets, or information we learn while working at Ford.

- Follow our local procedures for hosting visitors to protect confidential information and know-how.

85.    Under the heading "Communicating Responsibly," the Code of Conduct states the following, in relevant part:

We at Ford are deliberate and thoughtful in how we present ourselves. We carefully consider our public communications to ensure they reflect our values. Only certain people are authorized to speak on Ford's behalf, typically in close consultation with stakeholders.

41

As the Ford Team, we:

- Do not make public statements or commitments on Ford's behalf, or use Ford's name, logo, or other company materials in public communications unless we have authorization and approval to do so from a Communications leader

- Direct inquiries from outside Ford to the proper company resources and do not attempt to answer them on our own

- Do not make public references to competitors unless Communications, Marketing, OGC, or Investor Relations has given pre-approval to do so

- Do not share financial or material information about the business outside the company unless we have explicit approval from Investor Relations

- Follow Ford's guidelines on social media use, being honest and responsible in our online activities

86.     Under the heading "Trade Controls," the Code of Conduct states the following, in relevant part:

As a U.S.-based global company, we take seriously our obligation to comply with trade controls, which include both U.S. and applicable local export controls, sanctions, and antiboycott laws and regulations. Trade Controls govern the shipment, transfer, disclosure, release, and/or transmission of goods, software, technologies, and services and are critical to protecting national security and advancing foreign policy objectives. Recognizing the global reach and complexity of these laws and regulations, we understand trade controls can apply to any aspect of our business operations. Failure to meet our trade compliance obligations can lead to severe consequences, including hefty fines, trade restrictions, criminal penalties, potential loss of export privileges, and significant damage to our reputation.

As the Ford Team, we:

- Know that commercial activity with certain countries, territories, entities, individuals, or sectors is prohibited

- Understand that export control laws regulate certain goods, software, and technology and may limit who may receive such items based on the country involved, the end-user, or the end-use

- Remain alert to any suspicious activities, such as other parties sending our items to prohibited destinations or for prohibited end-uses

- Check with the Compliance, Ethics, and Integrity Office before we engage in military-related business

- Watch for boycott requests and understand that Ford does not participate in unlawful boycotts

- Conduct appropriate due diligence to comply with sanctions, export controls, and antiboycott requirements

- Maintain accurate and complete records related to trade compliance activities

### *Director Code of Ethics*

87.     Ford also utilizes a Code of Business Conduct and Ethics for Members of the Board of Directors (the "Director Code of Ethics"). The purpose of the Director Code of Ethics is "to focus the Board and each director on areas of ethical risk, provide guidance to directors to help them recognize and deal with ethical issues, provide mechanisms to report unethical conduct, and help foster a culture of honesty and accountability."

88.     Under the heading "Conflicts of Interest," the Director Code of Ethics

states the following, in relevant part:

> Directors must avoid any conflicts of interest between the director and
> the Company. Any situation that involves, or may reasonably be
> expected to involve, a conflict of interest with the Company should be
> disclosed promptly to the Chair of the Board of Directors, the Chair of
> the Nominating and Governance Committee, or the Presiding Director.

89.     Under the heading "Corporate Opportunities," the Director Code of

Ethics states the following:

> Directors are prohibited from: (a) taking for themselves personally
> opportunities related to the Company's business; (b) using the
> Company's property, information, or position for personal gain; or (c)
> competing with the Company for business opportunities, provided,
> however, if the Company's disinterested directors determine that the
> Company will not pursue an opportunity that relates to the Company's
> business, a director may do so.

90.     Under the heading "Confidentiality," the Director Code of Ethics states

the following:

> Directors should maintain the confidentiality of information entrusted
> to them by the Company and any other confidential information about
> the Company that comes to them, from whatever source, in their
> capacity as a director, except when disclosure is authorized or legally
> mandated. For purposes of this Code, "confidential information"
> includes all non-public information relating to the Company.

91.     Under the heading "Compliance with laws, rules and regulations: fair

dealing," the Director Code of Ethics states the following:

> Directors shall comply, and satisfy themselves that appropriate policies
> and procedures are in place for compliance by employees, officers and
> other directors, with laws, rules and regulations applicable to the

44

Company, including insider trading laws. Transactions in Company securities are governed by the Company's policies with respect to trading such securities and transactions in Company securities should be reviewed in advance with the Secretary's Office.

Directors shall satisfy themselves that appropriate policies and procedures are in place for fair dealing by employees and officers with the Company's customers, suppliers, competitors and employees.

92.     Under the heading "Compliance Procedures," the Director Code of Ethics states the following:

Any suspected violations of this Code should be reported promptly to the Chair of the Board of Directors, the Chair of the Nominating and Governance Committee or the Lead Independent Director. Violations will be investigated by the Board or by a person or persons designated by the Board and appropriate action will be taken in the event of any violations of the Code. Any waiver of this Code occurring subsequent to its effective date may be made only by the Board or the Nominating and Governance Committee and any such waiver will be promptly posted to the Company's public website.

### Code of Ethics for Senior Financial Personnel

93.     Ford has a Code of Ethics for Senior Financial Personnel, which applies to, among others, the Vice Chairman and CFO. Under the Code of Ethics for Senior Financial Personnel, there is an obligation to:

1) [T]o ensure that external and internal financial data, and other information contained in our public reports, are complete, accurate, timely, understandable, and present the facts fairly;

2) to uphold honest and ethical conduct, especially in relation to the handling of actual and apparent conflicts of interest. These conflicts may arise from any transaction between the Company (or other companies with which the Company does business) and an employee that is not part of a program generally available to

all employees or a Human Resources-approved program;

3) to report any conflict of interest (actual or apparent), any violation or suspected violation of this code of ethics, or any unusual event, in accordance with FM 90-1040 ; and

4) to ensure the Company is in full compliance with the law, all applicable rules and regulations, and Company policy, both in letter and in spirit.

### *Corporate Governance Principles*

94.     Ford represents that its Corporate Governance Guidelines are used to "provide the framework for the governance of [the] Company."

95.     Under a subheading titled "CEO/Management Oversight and Compensation," under the heading "Responsibilities and Duties," the Corporate Governance Principles state:

In addition to the Board's general oversight of the CEO and senior management, the Board also is responsible for:

- selecting, evaluating and compensating the CEO and overseeing CEO succession planning;

- providing counsel and oversight on the selection, evaluation, development and compensation of the officers of the Company; and

- approving and maintaining a succession plan for the CEO and other key senior executives, including an emergency succession plan for the CEO.

96.     Under a subheading in the same section titled "Business, Product and Strategic Matters/Compliance with Law and Company Policy," the Corporate

Governance Principles state:

> As part of its overall responsibility to serve the long-term interests of the shareholders, the Board also shall:
>
> - review, approve and monitor fundamental financial and business strategies and major Company actions;
>
> - review and discuss reports by management on the performance of the Company, its plans, products and prospects;
>
> - assess major risks facing the Company -- and review and approve strategies for addressing such risks; and
>
> - ensure processes are in place for maintaining the integrity and reputation of the Company --- the integrity of the financial statements, compliance with law and Company policy, the integrity of relationships with customers and suppliers, and the integrity of relationships with other Company stakeholders.

97. Under a subheading in the same section titled "Conflicts of Interest and Concern Reporting," the Corporate Governance Principles state:

> The Board expects Ford directors, as well as officers and employees, to act ethically at all times and in accordance with applicable Company codes of ethics. If an actual or potential conflict of interest arises for a director, the director shall promptly inform the Chair and the Lead Independent Director. If a significant conflict exists and cannot be resolved, the director should resign. All directors will recuse themselves from any discussion or decision affecting their personal, business or professional interests. The Board shall resolve any conflict of interest question involving the Chair, or a Board member, and the Board or a designated committee thereof comprised of independent directors shall resolve any conflict of interest question involving any other officer of the Company.

98. In violation of the Code of Conduct, Director Code of Ethics, Code of

Ethics for Senior Financial Personnel, and Corporate Governance Principles, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, and the aiding and abetting thereof. Moreover, three of the Individual Defendants violated the Code of Conduct by engaging in insider trading. Also, in violation of the Code of Conduct and Director Code of Ethics, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct and Director Code of Ethics, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Codes of Conduct and Director Code of Ethics.

## **<u>FORD'S AUDIT COMMITTEE CHARTER</u>**

99.     The Company also maintains an Audit Committee Charter (the "Audit Committee Charter"). According to the Audit Committee Charter, the purpose of the Audit Committee is to, *inter alia*:

> The Audit Committee shall provide assistance to the directors of the Company in fulfilling their responsibility to the shareholders relating to corporate accounting matters, the financial reporting practices of the Company, and the quality and integrity of the financial reports of the

Company. The Audit Committee's purpose is to:

1) assist the Board in its oversight of:

   o The reliability and integrity of the Company's accounting policies and financial reporting and disclosure practices;

   o The establishment and maintenance of processes to assure compliance with all relevant laws, regulations, and Company policy, including a process for receipt of complaints and concerns regarding management fraud and accounting, internal control or auditing matters;

   o The independent auditor's qualifications and independence; and

   o The performance of the Company's internal audit function and independent auditor.

2) Prepare the report of the Audit Committee to be included in the Company's annual proxy statement.

100. The Audit Committee Charter, under the heading "Responsibilities and Duties," states that:

The Audit Committee, in discharging its oversight role, is empowered to study or investigate any matter of interest or concern within the purpose of the Audit Committee that the Audit Committee deems appropriate or necessary and shall have the sole authority to retain and terminate outside counsel or other experts for this purpose, including the authority to approve the fees payable to such counsel or experts and any other terms of retention.

101. Under the same heading, in the subsection titled "*Documents/Reports Review*," the Audit Committee Charter states that the responsibilities of the Audit

Committee are as follows:

1) Review and discuss with management and the independent auditor the annual and quarterly financial statements prior to their filing, including the Company's disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and a discussion with the independent auditor of the matters required to be communicated by applicable Statements of Auditing Standards.

2) Discuss generally the Company's philosophy and processes associated with earnings press releases and financial information and earnings guidance provided to analysts and rating agencies.

3) Review with the independent auditor all critical accounting policies and practices to be used; all alternative treatments of financial information within generally accepted accounting principles ("GAAP") that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor; and other material written communications between the independent auditor and management, such as any management letter or schedule of unadjusted differences.

102.    Under the same heading, in the subsection titled "*The Independent Auditor*," the Audit Committee Charter states that the responsibilities of the Audit Committee are as follows:

4) Have the sole authority and responsibility to select (subject to shareholder ratification), evaluate, determine the compensation of and, where appropriate, replace the independent auditor. The Audit Committee shall review the performance of the independent auditor periodically and make determinations regarding the appointment or termination of the independent auditor. The independent auditor is ultimately accountable to the Audit Committee for such auditor's review of the financial statements and controls of the Company. On an annual basis, the Audit Committee will review and discuss with the independent auditor all significant relationships the auditor has with the Company to determine the auditor's independence.

5) At least annually, obtain and review a report by the independent auditor describing: the independent auditing firm's internal quality-control procedures; any material issues raised by the most recent internal quality control review, or peer review, of the firm, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the firm, and any steps taken to deal with any such issues; and all relationships between the independent auditor and the Company.

6) Oversee the independence of the auditor by:

o Receiving from the independent auditor, on a periodic basis, a formal written statement delineating all relationships between the independent auditor and the Company consistent with Independence Standards Board Standards and with all applicable laws, rules and regulations.

o Reviewing, and actively discussing with the Board, if necessary, and the independent auditor, on a periodic basis, any disclosed relationships or services that may impact the objectivity and independence of the auditor and to pre-approve any non-audit engagement between the Company and the independent auditor consistent with regulatory requirements and disclose any such engagements in the periodic reports of the Company.

o Developing clear hiring policies for employees or former employees of the independent auditor.

o Recommending, if necessary, that the Board take certain action to satisfy itself of the auditor's independence.

o Ensuring that the lead audit partner and the concurring review partner of the independent auditor are rotated as required by the Securities and Exchange Commission's auditor independence rules.

103.    Under the same heading, in the subsection titled "*Financial Reporting Process*," the Audit Committee Charter states that the responsibilities of the Audit

Committee are as follows:

7) In consultation with the independent auditor and the internal auditor, review the integrity of the financial reporting processes, both internal and external.

8) Review, with the Company's Disclosure Committee: (i) the Company's disclosure controls and procedures; (ii) any significant deficiencies in the design or operation of internal controls of the Company which could adversely affect the Company's ability to record, process, summarize and report financial data; and (iii) any fraud, material or otherwise, that involves management or other employees who have a significant role in the Company's internal controls.

9) Consider and approve, if appropriate, major changes to auditing and accounting principles and practices as suggested by the independent auditor, management, or the General Auditor's Office.

10)    Establish regular systems for review with the Audit Committee by finance management, the independent auditor and the General Auditor's Office reports regarding any significant judgments made, or significant disagreements, in management's preparation of the financial statements. As a part thereof, the Audit Committee shall review any problems or difficulties encountered during the course of the review or audit, including any restrictions on the scope of work or access to required information and management's response.

11)    Review with management the Company's use and presentation of non-GAAP measures and performance metrics (financial and non-financial) to understand how they are used by the Company to evaluate performance, and whether they are consistently prepared and presented from period to period.

104.    Under the same heading, in the subsection titled "*Ethical and Legal Compliance/General*," the Audit Committee Charter states that the responsibilities of the Committee as follows:

12)     Review, with the Office of the General Counsel, any legal or regulatory matter that could have a significant impact on the financial statements.

13)     Establish procedures for the receipt, retention and treatment of complaints and concerns (including a procedure for submitting such complaints and concerns on a confidential and anonymous basis) received by the Company regarding management fraud and accounting, internal accounting controls, or auditing or related matters.

14)     Ensure management has a proper review system in place to ensure that financial statements, reports, and other financial information disseminated to governmental organizations and the public satisfy legal requirements.

15)     Review activities, organization structure, and qualifications of the General Auditor's Office, and participate in the appointment, dismissal, evaluation and the determination of the compensation of the General Auditor.

16)     Review, at least annually, policies with respect to risk assessment and risk management and, in accordance with regulatory requirements, approve, at least annually, the Company's decision to enter into uncleared swaps.

17)     Establish a code of ethics for the senior financial personnel of the Company in accordance with applicable law, rules and regulations.

18)     Perform any other activities consistent with this Charter, the By-Laws of the Company, New York Stock Exchange rules and any other applicable law, rules or regulations as the Audit Committee or the Board deems necessary or appropriate.

19)     Review and discuss with management, the independent auditor, and the General Auditor: (a) the adequacy and effectiveness of the Company's internal controls over financial reporting (including any significant deficiencies or material weaknesses therein and any significant or material changes thereto); (b) management's assessment of the effectiveness of its internal controls and the basis therefor; (c) the

independent auditor's attestation of management's assessment, and its audit of the Company's internal controls over financial reporting; (d) the Company's internal audit function and procedures; and (e) the adequacy and effectiveness of the Company's disclosure controls and procedures, and management's evaluation thereof.

20) Exercise reasonable oversight with respect to the implementation and effectiveness of the Company's compliance and ethics program, including being knowledgeable about the content and operation of such compliance and ethics program.

105. Under the same heading, in the subsection titled "*Reports*," the Audit Committee Charter states that the responsibilities of the Committee as follows:

21) Report regularly to the Board (i) following meetings of the Audit Committee, (ii) with respect to such other matters as are relevant to the Audit Committee's discharge of its responsibilities, (iii) with respect to such recommendations as the Audit Committee may deem appropriate, and (iv) the Audit Committee's conclusions with respect to the independent auditor. The report to the Board may take the form of an oral report by the Chair or any other member of the Audit Committee designated by the Audit Committee to make such report.

22) Prepare and publish an annual report of the Audit Committee to be included in the Company's Proxy Statement.

23) Maintain minutes and other records of meetings and activities of the Audit Committee, as appropriate under Delaware law.

106. In violation of the Audit Committee Charter, the Individual Defendants (as key officers and members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of

fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## **THE INDIVIDUAL DEFENDANTS' MISCONDUCT**

### **Background**

107.    Ford is a company that designs, produces, and distributes its automobiles such as trucks, SUVs, and commercial vehicles under the Ford and Lincoln brandings. Ford's business model consists of three segments: Ford Blue, which provides gas-powered and hybrid vehicles; Ford Model e, which develops electric vehicles; and Ford Pro, which suits vehicles and services towards customer needs.

108.    Ford offers a warranty on every vehicle the Company sells. The warranties vary based on the type of product sold, as well as the geographic area where the product is sold. Should a vehicle experience some kind of issue due to a factory-supplied defective part or workmanship during the warranty period, the Company will repair, replace, or adjust parts of the vehicle.

109.    In addition to costs incurred from offering this warranty coverage to consumers, the Company will also occasionally incur costs due to what the Company refers to as "field service actions." A "field service action" may be a safety recall, emission recall, or other kind of product campaigns.

**False and Misleading Statements**

***April 27, 2022 Press Release***

110.    On April 27, 2022, the Company issued a press release announcing its financial results for the first quarter of the 2022 Fiscal Year (the "1Q 2022 Press Release"). The 1Q 2022 Press Release reported, among other things, that Ford's revenue for the quarter was $34.5 billion, while also reporting a net loss of $3.1 billion.

***April 28, 2022 10-Q***

111.    The following day, the Company filed the 1Q 2022 10-Q with the SEC. The 1Q 2022 10-Q was signed by Defendants Farley and Lawler and attached certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Farley and Lawler attesting to the accuracy of the 1Q 2022 10-Q and that the "information included in this [1Q 2022 10-Q], fairly present in all material respects the financial condition, results of operations and cash flows of the [Company]."

112.    The 1Q 2022 10-Q affirmed the 1Q 2022 Press Release's financial

results.

113.    The 1Q 2022 10-Q also reported on the Company's estimated warranty and field service action costs. In reporting an increase to the estimated warranty costs, the 1Q 2022 10-Q stated:

| | First Quarter | |
| | 2021 | 2022 |
|---|---|---|
| Beginning balance | $ 8,172 | $ 8,451 |
| Payments made during the period | (1,086) | (984) |
| Changes in accrual related to warranties issued during the period | 1,000 | 793 |
| Changes in accrual related to pre-existing warranties | (141) | 21 |
| Foreign currency translation and other | (40) | 38 |
| Ending balance | $ 7,905 | $ 8,319 |

In brief, the 1Q 2022 10-Q gave an "estimate of reasonably possible costs in excess of [Ford's] accruals for material field service actions and customer satisfaction actions is a ***range of up to about $700 million in the aggregate***."

### *July 27, 2022 Press Release*

114.    On July 27, 2022, the Company issued a press release announcing its financial results for the second quarter of the 2022 Fiscal Year (the "2Q 2022 Press Release"). The 2Q 2022 Press Release reported, among other things, that Ford's revenue for the quarter was $40.2 billion, while also reporting a net income of $0.7 billion.

### *July 28, 2022 10-Q*

115.    The following day, the Company filed its quarterly report on Form 10-

Q for the second quarter of the 2022 Fiscal Year with the SEC (the "2Q 2022 10-Q"). The 2Q 2022 10-Q was signed by Defendants Farley and Lawler and included SOX certifications signed by Defendants Farley and Lawler attesting to its accuracy and that the "information included in this [2Q 2022 10-Q], fairly present in all material respects the financial condition, results of operations and cash flows of the [Company]."

116.   The 2Q 2022 10-Q affirmed the 2Q 2022 Press Release's financial results.

117.   The 2Q 2022 10-Q also reported on the Company's estimated warranty and field service action costs. In providing an increase to the estimated warranty

| | First Half | |
| | 2021 | 2022 |
| --- | --- | --- |
| Beginning balance | $ 8,172 | $ 8,451 |
| Payments made during the period | (2,169) | (2,006) |
| Changes in accrual related to warranties issued during the period | 1,933 | 1,877 |
| Changes in accrual related to pre-existing warranties | 80 | 395 |
| Foreign currency translation and other | (5) | (120) |
| Ending balance | $ 8,011 | $ 8,597 |

costs, the 2Q 2022 10-Q stated:

In brief, the Company estimated an "estimate of reasonably possible costs in excess of [Ford's] accruals for material field service actions and customer satisfaction actions is a *range of up to about $700 million in the aggregate*."

### *October 26, 2022 Press Release*

118.   On October 26, 2022, the Company issued a press release announcing

its financial results for the third quarter of the 2022 Fiscal Year (the "3Q 2022 Press Release"). The 3Q 2022 Press Release reported, among other things, that Ford's revenue for the quarter was $39.4 billion, while also reporting a net loss of $0.8 billion.

### *October 27, 2022 10-Q*

119.    The following day, the Company filed its quarterly report on Form 10-Q for the third quarter of the 2022 Fiscal Year with the SEC (the "3Q 2022 10-Q"). The 3Q 2022 10-Q was signed by Defendants Farley and Lawler and included SOX certifications signed by Defendants Farley and Lawler attesting to its accuracy and that the "information included in this [3Q 2022 10-Q], fairly present in all material respects the financial condition, results of operations and cash flows of the [Company]."

120.    The 3Q 2022 10-Q affirmed the 2Q 2022 Press Release's financial results.

121.    The 3Q 2022 10-Q also reported on the Company's estimated warranty and field service action costs. In reporting an increase to the estimated warranty

| | First Nine Months | |
| | 2021 | 2022 |
|---|---|---|
| Beginning balance | $  8,172 | $  8,451 |
| Payments made during the period | (3,109) | (3,063) |
| Changes in accrual related to warranties issued during the period | 2,819 | 2,806 |
| Changes in accrual related to pre-existing warranties | 44 | 449 |
| Foreign currency translation and other | (77) | (241) |
| Ending balance | $  7,849 | $  8,402 |

costs, the 3Q 2022 10-Q stated:

In brief, the Company estimated an "estimate of reasonably possible costs in excess of [Ford's] accruals for material field service actions and customer satisfaction actions is a ***range of up to about $700 million in the aggregate***."

### *February 2, 2023 Press Release*

122.   On February 2, 2023, the Company issued a press release announcing its financial results for the fourth quarter as well as full year of the 2022 Fiscal Year (the "FY 2022 Press Release"). The FY 2022 Press Release reported, among other things, that Ford's revenue for the fourth quarter was $44 billion, while also reporting a net income of $1.3 billion.

123.   In addition, the FY 2022 Press Release announced a full year revenue of $158.1 billion, with a full year net loss of $2 billion.

### *February 2, 2023 10-K*

124.   The following day, the Company filed its annual report on Form 10-K for the 2022 Fiscal Year with the SEC (the "2022 10-K"). The 2022 10-K was signed by Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, Weinberg, and Lawler. The 2022 10-K also included SOX certifications signed by Defendants Farley and Lawler attesting to its accuracy and that the "information included in this [2022 10-K], fairly present in all material respects the financial condition,

results of operations and cash flows of the [Company]."

125.   The 2022 10-K affirmed the FY 2022 Press Release's financial results.

126.   The 2022 10-K also reported on the Company's estimated warranty and field service action costs. In reporting an increase to the estimated warranty

| | 2021 | | 2022 | |
|---|---|---|---|---|
| Beginning balance | $ | 8,172 | $ | 8,451 |
| Payments made during the period | | (3,952) | | (4,166) |
| Changes in accrual related to warranties issued during the period | | 4,102 | | 4,028 |
| Changes in accrual related to pre-existing warranties | | 221 | | 1,134 |
| Foreign currency translation and other | | (92) | | (254) |
| Ending balance | $ | 8,451 | $ | 9,193 |

costs, the 2022 10-K stated:

In brief, the Company estimated an "estimate of reasonably possible costs in excess of [Ford's] accruals for material field service actions and customer satisfaction actions is a *range of up to about $700 million in the aggregate*."

**March 31, 2023 Proxy Statement**

127.   On March 31, 2023, the Company filed its definitive proxy statement with the SEC pursuant to Section 14(a) of the Exchange Act (the "2023 Proxy Statement"). Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg solicited the 2023 Proxy Statement, pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

128.   The 2023 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) re-elect Defendants Casiano, English, Farley, H. Ford, W.

Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg to the Board; (2) ratify the selection of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the 2023 Fiscal Year; (3) approve, on an advisory basis, the compensation of the Company's named executive officers; (4) approve, on an advisory basis, the frequency of future shareholder votes on the compensation of the Company's named executive officers; and (5) approve the 2023 LTIP. As disclosed in the 2023 Proxy Statement, the prior effective Long Term Incentive Plan (from 2018) was set to expire on May 1, 2023.

129.    The 2023 Proxy Statement noted that if the Ford shareholders approved the 2023 LTIP, "awards of shares of common stock, PSUs, RSUs, stock options, and various other rights relating to common stock (collectively, "Plan Awards") may be granted to officers and other key employees, consultants, and advisors who are designated by the [Compensation, Talent and Culture] Committee to participate in the 2023 Plan." Further, the 2023 Proxy Statement noted that "[e]mployees (including executive officers and directors who are also the Company's employees, if any) and consultants and advisors to the Company and its subsidiaries are eligible to participate in the 2023 Plan."

130.    Three of the Individual Defendants received lucrative compensation, while numerous of them made false and misleading statements, during and after the

solicitation of the 2023 Proxy Statement. Shareholders would not have approved the

proposals in the 2023 Proxy Statement, and thus, the 2023 LTIP, had they known

the truth about Ford.

**AMOUNTS RECEIVED UNDER THE 2023 LTIP**

| Individual | Date | Shares of Ford Restricted Stock Units[4] Awarded |
|---|---|---|
| *James D. Farley, Jr.*, defendant, CEO, Director | **03/04/2024** | 509,890 |
| | **TOTAL Ford Restricted Stock Units:** | **509,890** |
| *John T. Lawler*, defendant, Vice Chair and CFO | **03/04/2024** | 135,635 |
| | **TOTAL Ford Restricted Stock Units:** | **135,635** |
| *William Clay Ford, Jr.*, defendant, Executive Chairman | **03/04/2024** | 397,488 |
| | **TOTAL Ford Restricted Stock Units:** | **397,488** |

131.    Regarding "The Board's Role in Risk Management," the 2023 Proxy

Statement stated the following, in relevant part:

---

[4] As represented in Form 4s filed with the SEC on March 5, 2024, Ford Restricted Stock Units will be converted into shares of Common Stock to the extent of 33% after one year from the date of granting (March 4, 2024), 66% after two years, and in full after three years.

The oversight responsibility of the Board and its committees is supported by Company management and the risk management processes that are currently in place. Ford has extensive and effective risk management processes, relating specifically to compliance, reporting, operating, and strategic risks.

- *Compliance Risk* encompasses matters such as legal and regulatory compliance (e.g., Foreign Corrupt Practices Act, environmental, OSHA/safety, etc.).

- *Reporting Risk* covers Sarbanes-Oxley compliance, disclosure controls and procedures, and accounting compliance.

- *Operating Risk* addresses the myriad of matters related to the operation of a complex company such as Ford (e.g., quality, supply chain, sales and service, financing and liquidity, product development and engineering, labor, etc.).

- *Strategic Risk* encompasses somewhat broader and longer-term matters, including, but not limited to, technology development, environmental and social sustainability, capital allocation, management development, retention and compensation, competitive developments, and geopolitical developments.

We believe that key success factors in risk management at Ford include a strong risk analysis tone set by the Board and senior management, which is shown through their commitment to effective top-down and bottom-up communication (including communication between management and the Board and Committees), and active cross-functional participation among the Business Segments and Skill Teams. We have institutionalized a regular Forecast, Controls and Risk Review and Special Attention Review process where the senior leadership of the Company reviews the status of the business, the risks and opportunities presented to the business (in the areas of compliance, reporting, operating, and strategic risks), and develops specific plans to address those risks and opportunities.

The Enterprise Risk Management process adopted by the Company identifies the top critical enterprise risks through a survey process of

senior management and the Board of Directors. Once identified, each of the top risks is assigned an executive risk owner who is responsible to oversee risk assessment, develop mitigation plans, and provide regular updates. The Enterprise Risk Management process also engages Business Segments and Skill Teams to determine which of the enterprise risks are most relevant to their specific objectives, and identify any additional risks that can be managed at a lower level in the organization. All identified Enterprise Critical Risks are evaluated for their exposure to related geopolitical risk and climate change impacts. The Audit Committee and Board annually review the process to update the list of critical risks and monitor risk movement and emerging trends, and the Enterprise Risk Management team also reviews the annual survey results with outside advisors to ensure the Company assessment is up to date with external risk developments.

As noted above, the full Board of Directors has overall responsibility for the oversight of risk management at Ford and oversees operating risk management with reviews at each of its regular Board meetings. The Board of Directors has delegated responsibility for the oversight of specific areas of risk management to certain committees of the Board, with each Board committee reporting to the full Board following each committee meeting. The Audit Committee assists the Board of Directors in overseeing compliance and reporting risk, and the Enterprise Risk Management process itself. The Sustainability, Innovation and Policy Committee assists the Board of Directors in overseeing environmental and social sustainability risks, while the Compensation, Talent and Culture Committee assists the Board of Directors in overseeing risks related to compensation and people- related business strategies, including leadership succession and culture, diversity, and inclusion. The Board and the appropriate committees also periodically review other policies related to personnel matters, including those related to sexual harassment and anti-retaliation policies related to whistleblowers. The Board, the Sustainability, Innovation and Policy Committee, the Compensation, Talent and Culture Committee, the Finance Committee, and the Audit Committee all play a role in overseeing operating and strategic risk management.

The scope and severity of risks presented by cyber threats have increased dramatically, and constant vigilance is required to protect

against intrusions. We take cyber threats very seriously and regularly audit our cyber security capabilities. These audits are a useful tool for ensuring that we maintain a robust cyber security program to protect our investors, customers, employees, and intellectual property. The Audit Committee receives updates several times per year from the Chief Information Security Officer regarding technology and cyber security risk and conducts regular reviews of our cyber security practices, with report outs to the Board as appropriate. As part of its risk assessment procedures, the Board reviews relevant cyber security and information technology matters at least twice annually.

We also maintain an industry-leading cyber security insurance program with many of the world's largest and most respected insurance companies. Additionally, we are a founding member of the Board of the Automotive Information Sharing and Analysis Center. Our current seat on that board ensures that we preserve relationships that help to protect ourselves against both enterprise and in-vehicle security risks.

132.    Regarding the Code of Conduct, Director Code of Ethics, and the Code of Ethics for Senior Financial Personnel the 2023 Proxy Statement stated the following, in relevant part:

Ford is committed to operating its business with the highest level of integrity. The Company has published on its website (www.corporate.ford.com) its Code of Conduct, which all officers and employees are required to follow. These expectations are reinforced in mandatory online training courses for all Ford salaried full-time, part-time, and agency workers, including an annual Code of Conduct course. These courses are periodically refreshed and reviewed to ensure the content remains relevant and appropriate. In addition, the Company has adopted, and published on its website, codes of ethics that apply to all directors and senior financial personnel, including the chief executive officer. Any waiver of, or amendments to, the codes of ethics for directors or executive officers, including the chief executive officer, the chief financial officer, and the principal accounting officer, must be approved by the Nominating and Governance Committee, and any such waivers or amendments will be disclosed promptly by the Company by posting such waivers or amendments to its website. Both the Audit

Committee and the Nominating and Governance Committee review management's monitoring of compliance with the Company's Code of Conduct. Printed copies of each of the codes of ethics referred to above are also available by writing to our Shareholder Relations Department at Ford Motor Company, Shareholder Relations, P.O. Box 6248, Dearborn, MI 48126.

133.   Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg caused the 2023 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) Ford's quality assurance procedures for its vehicles have been deficient since the start of the Relevant Period; (2) as such, Ford has begun to experience higher warranty costs; (3) because of this, the Company's warranty reserves are not an accurate predictor of quality issues in vehicles sold by the Company since the start of the Relevant Period; (4) the Company's profitability was therefore reasonably likely to suffer as a result; (5) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval the 2023 LTIP and the 2024 Stock Plan; and (6) the Company failed to maintain internal controls.

134.   The 2023 Proxy Statement was also materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct, Director Code of Ethics, and the Code of Ethics for Senior Financial Personnel were not followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions

alleged herein; and (2) failing to report violations of the Code of Conduct, Director Code of Ethics, or the Code of Ethics for Senior Financial Personnel. Further, the 2023 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

135.   As a result of Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg causing the 2023 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company; (2) ratify the selection of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the 2023 Fiscal Year; (3) approve named executive officer compensation on an advisory, non-binding basis; (4) approve the frequency of future votes on named executive officer compensation; and (5) approve the 2023 LTIP.

136.   As a result of the shareholders approving the 2023 LTIP, there was a new plan in place upon the expiration of the preexisting plan. Three Individual Defendants, two of whom are current directors of the Company, received material personal benefits that they otherwise would not have received but for the issuance

of the false and misleading 2023 Proxy Statement and the shareholders approving the 2023 LTIP. Moreover, certain of the Individual Defendants continue to receive material personal benefits in the form of stock awards and will continue to receive material personal benefits in the form of stock awards pursuant to the 2023 LTIP in the future.

### May 2, 2023 Press Release

137.    On May 2, 2023, the Company issued a press release announcing its financial results for the first quarter of the 2023 Fiscal Year (the "1Q 2023 Press Release"). The 1Q 2023 Press Release reported, among other things, that Ford's revenue for the first quarter was $41.5 billion, while also reporting a net income of $1.8 billion.

### May 3, 2023 10-Q

138.    The following day, the Company filed its quarterly report on Form 10-Q for the first quarter of the 2023 Fiscal Year with the SEC (the "1Q 2023 10-Q"). The 1Q 2023 10-Q was signed by Defendants Farley and Lawler and included SOX certifications signed by Defendants Farley and Lawler attesting to its accuracy and that the "information included in this [1Q 2023 10-Q], fairly present in all material respects the financial condition, results of operations and cash flows of the [Company]."

139.    The 1Q 2023 10-Q affirmed the 1Q 2023 Press Release's financial

results.

140.    The 1Q 2023 10-Q also reported on the Company's estimated warranty
and field service action costs. In reporting an increase to the estimated warranty

| | | First Quarter | | |
|---|---|---|---|---|
| | | 2022 | | 2023 |
| Beginning balance | $ | 8,451 | $ | 9,193 |
| Payments made during the period | | (984) | | (990) |
| Changes in accrual related to warranties issued during the period | | 793 | | 972 |
| Changes in accrual related to pre-existing warranties | | 21 | | 226 |
| Foreign currency translation and other | | 38 | | (117) |
| Ending balance | $ | 8,319 | $ | 9,284 |

costs, the 1Q 2023 10-Q stated:

In brief, the Company estimated an "estimate of reasonably possible costs in excess
of [Ford's] accruals for material field service actions and customer satisfaction
actions is a *range of up to about $700 million in the aggregate*."

### July 27, 2023 Press Release

141.    On July 27, 2023, the Company issued a press release announcing its
financial results for the second quarter of the 2023 Fiscal Year (the "2Q 2023 Press
Release"). The 2Q 2023 Press Release reported, among other things, that Ford's
revenue for the second quarter was $45 billion, while also reporting a net income of
$1.9 billion.

### July 28, 2023 10-Q

142.    The following day, the Company filed its quarterly report on Form
10-Q for the second quarter of the 2023 Fiscal Year with the SEC (the "2Q 2023

10-Q"). The 2Q 2023 10-Q was signed by Defendants Farley and Lawler and included SOX certifications signed by Defendants Farley and Lawler attesting to its accuracy and that the "information included in this [2Q 2023 10-Q], fairly present in all material respects the financial condition, results of operations and cash flows of the [Company]."

143.   The 2Q 2023 10-Q affirmed the 2Q 2023 Press Release's financial results.

144.   The 2Q 2023 10-Q also reported on the Company's estimated warranty and field service action costs. In reporting an increase to the estimated warranty

| | First Half | |
|---|---|---|
| | 2022 | 2023 |
| Beginning balance | $   8,451 | $   9,193 |
| Payments made during the period | (2,006) | (2,011) |
| Changes in accrual related to warranties issued during the period | 1,877 | 2,146 |
| Changes in accrual related to pre-existing warranties | 395 | 882 |
| Foreign currency translation and other | (120) | (314) |
| Ending balance | $   8,597 | $   9,896 |

costs, the 2Q 2023 10-Q stated:

In brief, the Company estimated an "estimate of reasonably possible costs in excess of [Ford's] accruals for material field service actions and customer satisfaction actions is a ***range of up to about $1 billion in the aggregate***."

### *October 26, 2023 Press Release*

145.   On October 26, 2023, the Company issued a press release announcing its financial results for the third quarter of the 2023 Fiscal Year (the "3Q 2023 Press

Release"). The 3Q 2023 Press Release reported, among other things, that Ford's revenue for the third quarter was $43.8 billion, while also reporting a net income of $1.2 billion.

146.    The 3Q 2023 Press Release also announced how Ford was "Changing How it Works to Improve Quality, Costs." Regarding quality assurance, 3Q 2023 Press Release announced, *inter alia*, "Ford's third-quarter 2023 results illustrated how the company is beginning to fulfill the growth potential of the customer-focused Ford+ plan – and **underscored the vital role of higher quality and lower costs in driving profitability**."

147.    The 3Q 2023 Press Release also quoted Defendant Farley, who stated he's "very optimistic about the reality we're creating with Ford+." Defendant Farley's comments then continued, with the 3Q 2023 Press Release reporting:

> We're building a more dynamic, highly talented and customer-focused company at the intersection of great vehicles, iconic brands, innovative software and high-value services. . . We're also radically changing how we work with a series of actions that put the right people with the right capabilities in the right places across the organization, so that **our promise isn't masked by cost and quality issues**.

148.    The 3Q 2023 Press Release then reported Ford's approach to following through on these promises, revealing:

> **To attack quality and cost issues, Ford last week completed a sequence of organizational changes in support of Ford+, creating an end-to-end global industrial system** under Kumar Galhotra, who was named chief operating officer.

The system – comprising vehicle engineering and cycle planning, gas and hybrid programs, supply chain management, and manufacturing – is expected to be an effective and efficient operational engine for all three auto business segments: Ford Blue, Ford Model e and Ford Pro.

Farley said that Galhotra's organization together with Doug Field's EVs, Digital and Design team "will support the businesses and their customers with great technologies and products, ***while raising quality, reducing costs and rooting out waste with a vengeance***."

### October 26, 2023 10-Q

149.    That same day, the Company filed its quarterly report on Form 10-Q for the third quarter of the 2023 Fiscal Year with the SEC (the "3Q 2023 10-Q"). The 3Q 2023 10-Q was signed by Defendants Farley and Lawler and included SOX certifications signed by Defendants Farley and Lawler attesting to its accuracy and that the "information included in this [3Q 2023 10-Q], fairly present in all material respects the financial condition, results of operations and cash flows of the [Company]."

150.    The 3Q 2023 10-Q affirmed the 3Q 2023 Press Release's financial results.

151.    The 3Q 2023 10-Q also reported on the Company's estimated warranty and field service action costs. In revealing an increase to the estimated warranty

|  | First Nine Months | |
|  | 2022 | 2023 |
| --- | --- | --- |
| Beginning balance | $ 8,451 | $ 9,193 |
| Payments made during the period | (3,063) | (3,481) |
| Changes in accrual related to warranties issued during the period | 2,806 | 3,331 |
| Changes in accrual related to pre-existing warranties | 449 | 2,016 |
| Foreign currency translation and other | (241) | (274) |
| Ending balance | $ 8,402 | $ 10,785 |

costs, the 3Q 2023 10-Q stated:

In brief, the Company estimated an "estimate of reasonably possible costs in excess of [Ford's] accruals for material field service actions and customer satisfaction actions is a *range of up to about $1.5 billion in the aggregate*."

### *February 6, 2024 Press Release*

152.    On February 6, 2024, the Company issued a press release announcing its financial results for the fourth quarter and full year for the 2023 Fiscal Year (the "FY 2023 Press Release"). The FY 2023 Press Release reported, among other things, that Ford's revenue for the fourth quarter was $46 billion, while also reporting a net loss of $0.5 billion.

153.    The FY 2023 Press Release also announced a full year revenue of $176.2 billion, while also reporting a net income of $4.3 billion.

154.    In providing an "Outlook for Healthy '24," the FY 2023 Press Release announced:

> The company's *total costs are expected to be flat year-over-year*, the net of factors including the $2 billion in industrial cost improvements, offset by higher expenses for labor and major product-refresh actions.

> At a segment level, the outlook is for full-year 2024 EBIT of at least $8 billion to $9 billion from Ford Pro and about $7 billion to $7.5 billion from Ford Blue; an EBIT loss of $5.0 billion to $5.5 billion for Ford Model e; and earnings before taxes of about $1.5 billion from Ford Credit.

### *February 7, 2024 10-K*

155.   The following day, the Company filed with the SEC its annual report on Form 10-K for the 2023 Fiscal Year (the "2023 10-K"). The 2023 10-K was signed by Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, Weinberg, and Lawler. The 2023 10-K also included SOX certifications signed by Defendants Farley and Lawler attesting to its accuracy and that the "information included in this [2023 10-K], fairly present in all material respects the financial condition, results of operations and cash flows of the [Company]."

156.   The 2023 10-K affirmed the FY 2023 Press Release's financial results.

157.   The 2023 10-K also reported on the Company's estimated warranty

| | 2022 | 2023 |
|---|---|---|
| Beginning balance | $ 8,451 | $ 9,193 |
| Payments made during the period | (4,166) | (4,779) |
| Changes in accrual related to warranties issued during the period | 4,028 | 4,743 |
| Changes in accrual related to pre-existing warranties | 1,134 | 2,648 |
| Foreign currency translation and other | (254) | (301) |
| Ending balance | $ 9,193 | $ 11,504 |

and field service action costs. In reporting an increase to the estimated warranty costs, the 2023 10-K stated:

In brief, the Company estimated an "estimate of reasonably possible costs in excess of [Ford's] accruals for material field service actions and customer satisfaction actions is a ***range of up to about $1.3 billion in the aggregate***."

***March 29, 2024 Proxy Statement***

75

158.    On March 29, 2024, the Company filed the 2024 Proxy Statement with the SEC. Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg solicited the 2024 Proxy Statement, pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

159.    The 2024 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) re-elect Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg to the Board; (2) ratify the selection of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the 2024 Fiscal Year; (3) approve, on an advisory basis, the compensation of the Company's named executive officers; and (4) approve the 2024 Stock Plan. As disclosed in the 2024 Proxy Statement, the prior effective plan (the 2014 Stock Plan for Non-Employee Directors) expired on December 31, 2023. The 2024 Stock Plan became effective January 1, 2024, subject to stockholder approval.

160.    The 2024 Proxy Statement noted that if the Ford shareholders approved the 2024 Stock Plan, it would make "available for the granting of Awards for the ten-year term of the 2024 Plan is 10 million shares (the "Limit")." Further, the 2024 Proxy Statement noted that approval of the 2024 Stock Plan "awards of

[Restricted Stock Units (RSUs)] [5], restricted stock, stock options, and stock appreciation rights (collectively, "Awards") may be granted to non-employee Directors ("Eligible Directors") of the Company." The 2024 Stock Plan *requires* at least 68% of a director's annual Board fees be paid in RSUs.

161.    Certain of the Individual Defendants received lucrative compensation pursuant to the 2024 Stock Plan, while numerous of them made false and misleading statements, during and after the solicitation of the 2024 Proxy Statement. Shareholders would not have approved the proposals in the 2024 Proxy Statement, and thus, the 2024 Stock Plan, had they known the truth about Ford.

### AMOUNTS RECEIVED UNDER THE 2024 STOCK PLAN[6]

| Individual | Date | Shares of Ford Stock Units Awarded | Price Per Share / Totals |
|---|---|---|---|
| *Kimberly A Casiano*, defendant, Director | **05/16/2024** | 17,366 | $12.38 |
| | **TOTAL Ford Stock Units:** | **17,366** | **$214,991.08** |
| *Alexandra Ford English*, defendant, Director | **05/16/2024** | 25,444 | $12.38 |
| | **TOTAL Ford Stock Units:** | **25,444** | **$314,996.72** |
| *Henry Ford III*, defendant, Director | **05/16/2024** | 17,366 | $12.38 |

---

[5] Per the 2024 Proxy Statement, "An RSU is the right to receive up to the number of Shares described therein. . . Awards of RSUs vest immediately, and each Eligible Director chooses when such RSUs settle into Shares from the following options: (i) immediately upon grant; (ii) the earlier of five years from the Grant Date and separation from the Board; and (iii) separation from the Board."

[6] As represented in Form 4s filed with the SEC on May 17, 2024.

| | | | |
|---|---|---|---|
| | **TOTAL Ford Stock Units:** | **17,366** | **$214,991.08** |
| *William W Helman*, defendant, Director | **05/16/2024** | 17,366 | $12.38 |
| | **TOTAL Ford Stock Units:** | **17,366** | **$214,991.08** |
| *William E. Kennard*, defendant, Director | **05/16/2024** | 17,366 | $12.38 |
| | **TOTAL Ford Stock Units:** | **17,366** | **$214,991.08** |
| *John C. May II*, defendant, Director | **05/16/2024** | 25,444 | $12.38 |
| | **TOTAL Ford Stock Units:** | **25,444** | **$314,996.72** |
| *Beth E. Mooney*, defendant, Director | **05/16/2024** | 17,366 | $12.38 |
| | **TOTAL Ford Stock Units:** | **17,366** | **$214,991.08** |
| *John L. Thornton*, defendant, Director | **05/16/2024** | 17,366 | $12.38 |
| | **TOTAL Ford Stock Units:** | **17,366** | **$214,991.08** |
| *John B. Veihmeyer*, defendant, Director | **05/16/2024** | 27,867 | $12.38 |
| | **TOTAL Ford Stock Units:** | **27,867** | **$344,993.46** |
| *Lynn Vojvodich Radakovich*, defendant, Director | **05/16/2024** | 17,366 | $12.38 |
| | **TOTAL Ford Stock Units:** | **17,366** | **$214,991.08** |
| *John S. Weinberg*, defendant, Director | **05/16/2024** | 25,444 | $12.38 |
| | **TOTAL Ford Stock Units:** | **25,444** | **$314,996.72** |
| | | | |
| | | | |

162.    Regarding "The Board's Role in Risk Oversight," the 2024 Proxy Statement stated the following, in relevant part:

> The oversight responsibility of the Board and its committees is supported by Company management and the risk management processes that are currently in place. Ford has extensive and effective risk management processes, relating specifically to compliance, reporting, operating, and strategic risks.
>
> - *Compliance Risk* encompasses matters such as legal and regulatory compliance (e.g., Foreign Corrupt Practices Act, environmental, Occupational Safety and Health Administration/safety, etc.).
>
> - *Reporting Risk* covers Sarbanes-Oxley compliance, disclosure controls and procedures, and accounting compliance.
>
> - *Operating Risk* addresses the myriad of matters related to the operation of a complex company such as Ford (e.g., quality, supply chain, sales and service, financing and liquidity, product development and engineering, labor, etc.).
>
> - *Strategic Risk* encompasses somewhat broader and longer-term matters, including, but not limited to, technology development, environmental and social sustainability, capital allocation, management development, retention and compensation, competitive developments, and geopolitical developments.
>
> We believe that key success factors in risk management at Ford include a strong risk analysis tone set by the Board and senior management, which is shown through their commitment to effective top-down and bottom-up communication (including communication between management and the Board and Committees), and active cross-functional participation among the Business Segments and Skill Teams. We have institutionalized a regular Forecast, Controls and Risk Review and Special Attention Review process where the senior leadership of

the Company reviews the status of the business, the risks and opportunities presented to the business (in the areas of compliance, reporting, operating, and strategic risks), and develops specific plans to address those risks and opportunities.

The Enterprise Risk Management process adopted by the Company identifies the top critical enterprise risks through engagement with senior management and the Board of Directors. Once identified, each of the top risks is validated and assigned an executive risk owner who is responsible to oversee risk assessment, develop mitigation plans, and provide regular updates. The Enterprise Risk Management process also engages Business Segments and Skill Teams to determine which of the enterprise risks are most relevant to their specific objectives, and identify any additional risks that can be managed at a lower level in the organization. All identified Enterprise Critical Risks are evaluated for their exposure to related geopolitical risk and climate change impacts. The Audit Committee and Board annually review the process to update the list of critical risks and monitor risk movement and emerging trends, and the Enterprise Risk Management team also benchmarks the annual risk assessment with outside sources to ensure the Company assessment is up to date with external risk developments.

As noted above, the full Board of Directors has overall responsibility for the oversight of risk management at Ford and oversees operating risk management with reviews at each of its regular Board meetings. The Board of Directors has delegated responsibility for the oversight of specific areas of risk management to certain committees of the Board, with each Board committee reporting to the full Board following each committee meeting. The Audit Committee assists the Board of Directors in overseeing compliance and reporting risk, cybersecurity risk, and the Enterprise Risk Management process itself. The Sustainability, Innovation and Policy Committee assists the Board of Directors in overseeing environmental and social sustainability risks, while the Compensation, Talent and Culture Committee assists the Board of Directors in overseeing risks related to compensation and people-related business strategies, including leadership succession and culture, diversity, and inclusion. The Board and the appropriate committees also periodically review other policies related to personnel matters, including those related to sexual harassment and anti-retaliation policies related to whistleblowers. The Board, the

Sustainability, Innovation and Policy Committee, the Compensation, Talent and Culture Committee, the Finance Committee, and the Audit Committee all play a role in overseeing operating and strategic risk management.

The scope and severity of cybersecurity risks is evolving, and we devote significant resources to our security program that we believe is reasonably designed to protect against these risks. The Audit Committee receives regular updates on our cybersecurity practices as well as cybersecurity and information technology risks from our Chief Information Security Officer. These regular updates include topics related to cybersecurity practices, cyber risks, and risk management processes, such as updates to our cybersecurity programs and mitigation strategies, and other cybersecurity developments. In addition to these regular updates, as part of our incident response processes, the Chief Enterprise Technology Officer, in collaboration with the Chief Information Security Officer and General Counsel, provides updates on certain cybersecurity incidents to the Audit Committee and, in some cases, the Board. The Audit Committee reviews and provides input into and oversight of our cybersecurity processes, and in the event Ford determines it has experienced a material cybersecurity incident, the Audit Committee is notified about the incident in advance of filing a Current Report on Form 8-K. See our Annual Report on Form 10-K for the year ended December 31, 2023 for additional discussion regarding our cybersecurity risk management, strategy, and governance.

163.    Regarding the Code of Conduct, Director Code of Ethics, and the Code of Ethics for Senior Financial Personnel, the 2024 Proxy Statement stated the following, in relevant part:

Ford is committed to operating its business with the highest level of integrity. The Company has published on its website (www.corporate.ford.com) its Code of Conduct, which all officers and employees are required to follow. These expectations are reinforced in mandatory online training courses for all Ford salaried full-time, part-time, and agency workers, including an annual Code of Conduct course. These courses are periodically refreshed and reviewed to ensure the content remains relevant and appropriate. In addition, the Company has

adopted, and published on its website, codes of ethics that apply to all directors and senior financial personnel, including the chief executive officer. Any waiver of, or amendments to, the codes of ethics for directors or executive officers, including the chief executive officer, the chief financial officer, and the principal accounting officer, must be approved by the Nominating and Governance Committee, and any such waivers or amendments will be disclosed promptly by the Company by posting such waivers or amendments to its website. Both the Audit Committee and the Nominating and Governance Committee review management's monitoring of compliance with the Company's Code of Conduct. Printed copies of each of the codes of ethics referred to above are also available by writing to our Shareholder Relations Department at Ford Motor Company, Shareholder Relations, P.O. Box 6248, Dearborn, MI 48126.

164.    Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) Ford's quality assurance procedures for its vehicles have been deficient since the start of the Relevant Period; (2) as such, Ford has begun to experience higher warranty costs; (3) because of this, the Company's warranty reserves are not an accurate predictor of quality issues in vehicles sold by the Company since the start of the Relevant Period; (4) the Company's profitability was therefore reasonably likely to suffer as a result; (5) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval the 2023 LTIP and the 2024 Stock Plan; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at

all relevant times.

165.    The 2024 Proxy Statement was also materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct, Director Code of Ethics, and the Code of Ethics for Senior Financial Personnel were not followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct, Director Code of Ethics, or the Code of Ethics for Senior Financial Personnel. Further, the 2024 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

166.    As a result of Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company; (2) ratify the selection of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the 2024 Fiscal Year; (3) approve named executive officer

compensation on an advisory, non-binding basis; and (4) approve the 2024 Stock Plan.

167.    As a result of the shareholders approving the 2024 Stock Plan, the new plan became effective in place of the prior plan. The Individual Defendants, including many of whom are current directors of the Company, received material personal benefits that they otherwise would not have received but for the issuance of the false and misleading 2024 Proxy Statement and the shareholders approving the 2024 Stock Plan. Moreover, certain of the Individual Defendants continue to receive material personal benefits in the form of stock awards and will continue to receive material personal benefits in the form of stock awards pursuant to the 2024 Stock Plan in the future.

### *April 24, 2024 Press Release*

168.    On April 24, 2024, the Company issued a press release announcing its financial results for the first quarter of the 2024 Fiscal Year (the "1Q 2024 Press Release"). The 1Q 2024 Press Release reported, among other things, that Ford's revenue for the first quarter was $42.8 billion, while also reporting a net income of $1.3 billion.

### *April 25, 2024 10-Q*

169.    That same day, the Company filed its quarterly report on Form 10-Q for the first quarter of the 2024 Fiscal Year with the SEC (the "1Q 2024 10-Q"). The

1Q 2024 10-Q was signed by Defendants Farley and Lawler and included SOX certifications signed by Defendants Farley and Lawler attesting to its accuracy and that the "information included in this [1Q 2024 10-Q], fairly present in all material respects the financial condition, results of operations and cash flows of the [Company]."

170.    The 1Q 2024 10-Q affirmed the 1Q 2024 Press Release's financial results.

171.    The 1Q 2024 10-Q also reported on the Company's estimated warranty and field service action costs. In reporting an increase to the estimated warranty

| | First Quarter | |
| --- | --- | --- |
| | 2023 | 2024 |
| Beginning balance | $ 9,193 | $ 11,504 |
| Payments made during the period | (990) | (1,391) |
| Changes in accrual related to warranties issued during the period | 972 | 1,091 |
| Changes in accrual related to pre-existing warranties | 226 | 397 |
| Foreign currency translation and other | (117) | (61) |
| Ending balance | $ 9,284 | $ 11,540 |

costs, the 1Q 2024 10-Q stated:

In brief, the Company estimated an "estimate of reasonably possible costs in excess of [Ford's] accruals for material field service actions and customer satisfaction actions is a *range of up to about $1.3 billion in the aggregate*."

172.    The statements in ¶¶110-126, 137-157, and 168-171 were materially false and misleading because they failed to disclose, *inter alia*, that:  (1) Ford's

quality assurance procedures for its vehicles have been deficient since the start of the Relevant Period; (2) as such, Ford has begun to experience higher warranty costs; (3) because of this, the Company's warranty reserves are not an accurate predictor of quality issues in vehicles sold by the Company since the start of the Relevant Period; (4) the Company's profitability was therefore reasonably likely to suffer as a result; (5) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval the 2023 LTIP and the 2024 Stock Plan; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times

## <u>THE TRUTH EMERGES</u>

### *July 24, 2024 Press Release*

173.    The truth emerged on July 24, 2024 when the Company issued the 2Q 2024 Press Release, revealing its financial outcomes for the second quarter of the 2024 Fiscal Year. The 2Q 2024 Press Release revealed disappointing guidance as the result of "[*p]rofitability [being] affected by an increase in warranty reserves*." As such, the guidance for the Company's Ford Model e segment was lowered to "reflect[] higher warranty costs than originally planned."

174.    The 2Q 2024 Press Release explained the disappointing news, stating:

Company net income was $1.8 billion and adjusted earnings before interest and taxes, or EBIT, was $2.8 billion. ***Profitability was affected***

*by an increase in warranty reserves*, though efforts to lift the quality of new products are starting to pay off, with positive implications for customer satisfaction and Ford's operating performance.

175.    Defendant Lawler admitted in the 2Q 2024 Press Release that Ford had "lots of work ahead of us," among other things, stating, "We still have *lots of work ahead of us to raise quality and reduce costs* and complexity, but the team is committed and we're heading in the right direction."

176.    The 2Q 2024 Press Release revealed the final guidance as:

Capital expenditures for the year are still anticipated to be between $8.0 billion and $9.0 billion, with an enterprise-wide objective for the lower end of the range.

Outlooks for full-year EBIT are up for Ford Pro, to $9.0 billion to $10.0 billion, on further growth and favorable product mix, and down for Ford Blue, to $6.0 billion to $6.5 billion, reflecting higher warranty costs than originally planned.

### *July 25, 2024 Associated Press Article*

177.    On the morning of July 25, 2024, *The Associated Press* published an article entitled "Ford shares slide as disappointing Q2 adjusted profit rattles investors," which revealed that Ford's warranty and recall costs in the second quarter were as high as $2.3 billion, $800 million greater than in the first quarter of 2024, and a year-over-year growth of $700 million.

178.    On this news, the price of the Company's common stock fell $2.51 per share, or approximately 18.4%, from a closing price of $13.67 per share on July 24, 2024 to a closing price of $11.16 per share on July 25, 2024.

## **REPURCHASES DURING THE RELEVANT PERIOD**

179.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of ***over $727.2 million*** to repurchase approximately 54,780,000 shares of its own common stock at artificially inflated prices between November 2022 and June 2024.

180.    According the 2022 10-K, between November 1, 2022 and November 30, 2022, the Company repurchased 35,000,000 shares of its own common stock at an average price per share of approximately $13.81, for a total cost to the Company of approximately $483,350,000.

181.    As the Company's stock was actually worth only $11.16 per share, the price at closing on July 25, 2024, the Company overpaid by approximately $92,750,000 for repurchases of its own stock between November 1, 2022 and November 30, 2022.

182.    According to the 2Q 2024 10-Q, between May 1, 2024 and May 31, 2024, the Company repurchased 19,299,600 shares of its own common stock at an average price per share of approximately $12.34, for a total cost to the Company of approximately $238,157,064.

183.    As the Company's stock was actually worth only $11.16 per share, the price at closing on July 25, 2024, the Company overpaid by approximately

$22,773,528 for repurchases of its own stock between May 1, 2024 and May 31, 2024.

184.    According to the 2Q 2024 10-Q, between June 1, 2024 and June 30, 2024, the Company repurchased 480,400 shares of its own common stock at an average price per share of approximately $11.95, for a total cost to the Company of approximately $5,740,780.

185.    As the Company's stock was actually worth only $11.16 per share, the price at closing on July 25, 2024, the Company overpaid by approximately $379,516 for repurchases of its own stock between June 1, 2024 and June 30, 2024.

186.    Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by *$115,903,044*.

## DAMAGES TO FORD

187.    As a direct and proximate result of the Individual Defendants' conduct, Ford will lose and expend many millions of dollars.

188.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company; its President, CEO; and its Vice Chair, CFO, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

189.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgements associated with any other

lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

190.   Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

191.   Such expenditures include the $115,903,044 that the Individual Defendants caused the Company to overpay for repurchases of its own stock while the stock price was artificially inflated as a result of the false and misleading statements alleged herein.

192.   Additionally, these expenditures include, but are not limited to, excessive compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including payments made pursuant to the 2023 LTIP and 2024 Stock Plan as a result of shareholders approving the proposals discussed herein.

193.   As a direct and proximate result of the Individual Defendants' conduct, Ford has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the

Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

194.    Plaintiff brings this action derivatively and for the benefit of Ford to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Ford, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

195.    Ford is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

196.    Plaintiff is, and has been at all relevant times, a shareholder of Ford. Plaintiff will adequately and fairly represent the interests of Ford in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

197.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

198.    A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Ford's Board consisted of the following fifteen individuals: Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, May,

Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg (the "Director-Defendants") and non-partes Adriana Cisneros and Jon Huntsman, Jr. (collectively with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to eight of the fifteen Directors that were on the Board at the time this action was filed.

199.    Demand is excused as to all of the Director-Defendants because each of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, and as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by **_over $115.9 million_** for its own common stock during the Relevant Period. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme. Thus, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

200.    The Director-Defendants solicited the 2023 Proxy Statement to call for a shareholder vote to, *inter alia*, re-elect themselves to the Board, thus allowing them

to continue breaching their fiduciary duties to Ford.

201.    The Director-Defendants solicited the 2024 Proxy Statement to call for a shareholder vote to, *inter alia*, re-elect themselves to the Board, thus allowing them to continue breaching their fiduciary duties to Ford.

202.    In addition, the Director-Defendants caused the 2023 Proxy Statement to call for a shareholder vote to approve the 2023 LTIP, which made shares available to employees of the Company, including two of the Director-Defendants, for five years. The misrepresentations and omissions set forth herein were material to shareholders in voting to approve the 2023 LTIP who would not have approved the 2023 LTIP, had they been informed about the Individual Defendants' misconduct. Before the shareholders approved the 2023 LTIP at the annual meeting of stockholders of Ford on May 11, 2023, the then-existing plan terminated on May 1, 2023. After the shareholders approved the 2023 LTIP, the plan was effective for five years. For this reason, the Individual Defendants, including the Director-Defendants, received material personal benefits that they otherwise would not receive but for the issuance of the false and misleading 2023 Proxy Statement and the shareholders approving the 2023 LTIP. As such, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

203.    Moreover, Director-Defendants Farley and W. Ford have received material personal benefits pursuant to the 2023 LTIP between May 2023, when the

2023 LTIP was approved by way of the false and misleading 2023 Proxy Statement, and the date this action was filed. The specific awards of Restricted Stock Units to the Director-Defendants directly linked to the 2023 LTIP are disclosed in Ford's Form 4s and/or its proxies filed with the SEC and include (at least) the following:

### AMOUNTS RECEIVED UNDER THE 2023 LTIP

| Individual | Date | Shares of Ford Restricted Stock Units[7] Awarded |
|---|---|---|
| **James D. Farley, Jr.,** defendant, CEO, Director | **03/04/2024** | 509,890 |
| | **TOTAL Ford Restricted Stock Units:** | **509,890** |
| **William Clay Ford, Jr.,** defendant, Executive Chairman | **03/04/2024** | 397,488 |
| | **TOTAL Ford Restricted Stock Units:** | **397,488** |

204. In addition, the Director-Defendants caused the 2024 Proxy Statement to call for a shareholder vote to approve the 2024 Stock Plan, which made shares available to non-employee directors of the Company, including many of the Director-Defendants, for ten years. The misrepresentations and omissions set forth

---

[7] As represented in Form 4s filed with the SEC on March 5, 2024, Ford Restricted Stock Units will be converted into shares of Common Stock to the extent of 33% after one year from the date of granting (March 4, 2024), 66% after two years, and in full after three years.

herein were material to shareholders in voting to approve the 2024 Stock Plan, who would not have approved the 2024 Stock Plan, had they been informed about the Individual Defendants' misconduct. Before the shareholders approved the 2024 Stock Plan at the annual meeting of stockholders of Ford on May 9, 2024, the then-existing plan terminated on December 31, 2023. After the shareholders approved the 2024 Stock Plan, the plan was effective for an additional ten years. For this reason, the Individual Defendants, including the Director-Defendants, received material personal benefits that they otherwise would not receive but for the issuance of the false and misleading 2024 Stock Plan and the shareholders approving the 2024 Stock Plan. As such, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them

205.   Moreover, Director-Defendants Casiano, English, H. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg have received material personal benefits pursuant to the 2024 Stock Plan between May 2024, when the 2024 Stock Plan was approved by way of the false and misleading 2024 Proxy Statement, and the date this action was filed. The specific awards of Ford Stock Units to the Director-Defendants directly linked to the 2024 Stock Plan are disclosed in Ford's Form 4s and/or its proxies filed with the SEC and include (at least) the following:

**AMOUNTS RECEIVED UNDER THE 2024 STOCK PLAN**[8]

| Individual | Date | Shares of Ford Stock Units Awarded | Price Per Share /Totals |
|---|---|---|---|
| *Kimberly A Casiano*, defendant, Director | **05/16/2024** | 17,366 | $12.38 |
| | **TOTAL Ford Stock Units:** | **17,366** | **$214,991.08** |
| *Alexandra Ford English*, defendant, Director | **05/16/2024** | 25,444 | $12.38 |
| | **TOTAL Ford Stock Units:** | **25,444** | **$314,996.72** |
| *Henry Ford III*, defendant, Director | **05/16/2024** | 17,366 | $12.38 |
| | **TOTAL Ford Stock Units:** | **17,366** | **$214,991.08** |
| *William W Helman*, defendant, Director | **05/16/2024** | 17,366 | $12.38 |
| | **TOTAL Ford Stock Units:** | **17,366** | **$214,991.08** |
| *William E. Kennard*, defendant, Director | **05/16/2024** | 17,366 | $12.38 |
| | **TOTAL Ford Stock Units:** | **17,366** | **$214,991.08** |
| *John C. May II*, defendant, Director | **05/16/2024** | 25,444 | $12.38 |
| | **TOTAL Ford Stock Units:** | **25,444** | **$314,996.72** |
| *Beth E. Mooney*, defendant, Director | **05/16/2024** | 17,366 | $12.38 |
| | **TOTAL Ford Stock Units:** | **17,366** | **$214,991.08** |
| *John L. Thornton*, defendant, Director | **05/16/2024** | 17,366 | $12.38 |

---

[8] As represented in Form 4s filed with the SEC on May 17, 2024.

| | | | |
|---|---|---|---|
| | **TOTAL Ford Stock Units:** | **17,366** | **$214,991.08** |
| *John B. Veihmeyer*, defendant, Director | 05/16/2024 | 27,867 | $12.38 |
| | **TOTAL Ford Stock Units:** | **27,867** | **$344,993.46** |
| *Lynn Vojvodich Radakovich*, defendant, Director | 05/16/2024 | 17,366 | $12.38 |
| | **TOTAL Ford Stock Units:** | **17,366** | **$214,991.08** |
| *John S. Weinberg*, defendant, Director | 05/16/2024 | 25,444 | $12.38 |
| | **TOTAL Ford Stock Units:** | **25,444** | **$314,996.72** |

206.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Ford to issue materially false and misleading statements. Specifically, the Director-Defendants caused Ford to issue false and misleading statements which were intended to obscure the ineffectiveness of Ford' quality assurance procedures and warranty reserves. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested or independent, and demand upon them is futile, and thus excused.

207.    Additional reasons that demand on Defendant Farley is futile to follow. Defendant Farley has served as the President and CEO and as a director of the Company since October 2020. Thus, as the Company admits, he is a non-

independent director. The Company provides Defendant Farley with his principal occupation, for which he receives handsome compensation for his role at the Company. He also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Casiano, English, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2023 LTIP.  Furthermore, he solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Casiano, English, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2024 Stock Plan. As the trusted CEO, Defendant Farley conducted little, if any oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein and personally made many of the false and misleading statements alleged herein. He is also a defendant in the Securities Class Action.

Moreover, under the 2023 LTIP, Defendant Farley is eligible to receive stock awards under the 2023 LTIP, has received various amounts of stock awards under the 2023 LTIP, and will receive various amounts of stock awards under the 203 LTIP in the future, thereby materially benefiting from the adoption of the 2023 LTIP. Furthermore, he engaged in lucrative insider trading obtaining personal profits of approximately $1.0 million. For these reasons, too, Defendant Farley faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

208. Additional reasons that demand on Defendant Casiano is futile to follow. Defendant Casiano has served as a Company director since 2003. She also serves as a member of the Audit Committee, a member of the Nominating and Governance Committee, and a member of the Sustainability, Innovation and Policy Committee. Defendant Casiano received and continues to receive handsome compensation for her role as a Company director. She also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg, and herself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2023 LTIP. Furthermore, she solicited the 2024 Proxy Statement, which contained false and misleading

statements and contributed to the re-election of Defendants English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg, and herself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2024 Stock Plan. As a trusted-long time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, under the 2024 Stock Plan, Defendant Casiano is eligible to receive stock awards under the 2024 Stock Plan, has received various amounts of stock awards under the 2024 Stock Plan, and will receive various amounts of stock awards under the 2024 Stock Plan in the future, thereby materially benefiting from the adoption of the 2024 Stock Plan. For these reasons, too, Defendant Casiano breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

209.  Additional reasons that demand on Defendant English is futile to follow. Defendant English has served as a Company director since 2021. She also serves as a member of the Finance Committee, and as a member of the Sustainability, Innovation and Policy Committee. Previously, Defendant English served as an

employee of Ford between July 2017 and June 2022, most recently serving as Director of Global Brand Merchandising. As a member of the Ford family, Defendant English is the daughter of Defendant W. Ford and second cousin to Defendant H. Ford and is therefore beholden to them. Thus, as the Company admits, she is a non-independent director. Defendant English received and continues to receive handsome compensation for her role as a Company director. She also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Casiano, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg, and herself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2023 LTIP. Furthermore, she solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Casiano, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg, and herself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2024 Stock Plan. As a trusted-long time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously

disregarded her duties to protect corporate assets. Moreover, under the 2024 Stock Plan, Defendant English is eligible to receive stock awards under the 2024 Stock Plan, has received various amounts of stock awards under the 2024 Stock Plan, and will receive various amounts of stock awards under the 2024 Stock Plan in the future, thereby materially benefiting from the adoption of the 2024 Stock Plan. For these reasons, too, Defendant English breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

210.   Additional reasons that demand on Defendant H. Ford is futile to follow. Defendant H. Ford has served as a Company director since 2021. He also serves as a member of the Finance Committee, and a member of the Sustainability, Innovation and Policy Committee. Previously, Defendant H. Ford served as an employee of Ford between February 2006 and June 2021, most recently serving as Director of Investor Relations. As a member of the Ford family, Defendant H. Ford is the second cousin of Defendants W. Ford and Defendant English and is therefore beholden to them. Thus, as the Company admits, he is a non-independent director. Defendant H. Ford received and continues to receive handsome compensation for his role as a Company director. He also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Casiano, English, Farley, W. Ford, Helman, Kennard, May, Mooney,

Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2023 LTIP. Furthermore, he solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Casiano, English, Farley, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2024 Stock Plan. As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, under the 2024 Stock Plan, Defendant H. Ford is eligible to receive stock awards under the 2024 Stock Plan, has received various amounts of stock awards under the 2024 Stock Plan, and will receive various amounts of stock awards under the 2024 Stock Plan in the future, thereby materially benefiting from the adoption of the 2024 Stock Plan. For these reasons, too, Defendant H. Ford breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

211.   Additional reasons that demand on Defendant W. Ford is futile to follow. Defendant W. Ford has served as a Company director since 1988 and has served as the Board's Executive Chairman since January 1999. Previously, Defendant W. Ford served as the Company's CEO between October 2001 until September 2006. He is also the Chair of the Finance Committee and a member of the Sustainability, Innovation and Policy Committee. As a member of the Ford family, Defendant W. Ford is father of Defendant English and the second cousin of Defendant H. Ford and they are therefore beholden to him. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant W. Ford with his principal occupation, for which he receives handsome compensation for his role at the Company. He also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Casiano, English, Farley, H. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2023 LTIP.  Furthermore, he solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Casiano, English, Farley, H. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the

Company and caused shareholders to approve the 2024 Stock Plan. As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, under the 2023 LTIP, Defendant W. Ford is eligible to receive stock awards under the 2023 LTIP, has received various amounts of stock awards under the 2023 LTIP, and will receive various amounts of stock awards under the 2023 LTIP in the future, thereby materially benefiting from the adoption of the 2023 LTIP. For these reasons, too, Defendant W. Ford breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

212. Additional reasons that demand on Defendant Helman is futile to follow. Defendant Helman has served as a Company director since 2011. He also serves as the Chair of the Sustainability, Innovation and Policy Committee and as a member of the Finance Committee and a member of the Nominating and Governance Committee. Defendant Helman received and continues to receive handsome compensation for his role as a Company director. He also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Casiano, English, Farley, H. Ford, W.

Ford, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2023 LTIP. Furthermore, he solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Casiano, English, Farley, H. Ford, W. Ford, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2024 Stock Plan. As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, under the 2024 Stock Plan, Defendant Helman is eligible to receive stock awards under the 2024 Stock Plan, has received various amounts of stock awards under the 2024 Stock Plan, and will receive various amounts of stock awards under the 2024 Stock Plan in the future, thereby materially benefiting from the adoption of the 2024 Stock Plan. For these reasons, too, Defendant Helman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

213.   Additional reasons that demand on Defendant Kennard is futile to follow. Defendant Kennard has served as a Company director since 2015. He is also the Chair of the Nominating and Governance Committee, as well as a member of the Finance Committee and the Sustainability, Innovation and Policy Committee. Defendant Kennard received and continues to receive handsome compensation for his role as a Company director. He also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2023 LTIP.  Furthermore, he solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2024 Stock Plan. As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to

protect corporate assets. Moreover, under the 2024 Stock Plan, Defendant Kennard is eligible to receive stock awards under the 2024 Stock Plan, has received various amounts of stock awards under the 2024 Stock Plan, and will receive various amounts of stock awards under the 2024 Stock Plan in the future, thereby materially benefiting from the adoption of the 2024 Stock Plan. For these reasons, too, Defendant Kennard breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

214.    Additional reasons that demand on Defendant May is futile to follow. Defendant May has served as a Company director since 2021. He is also a member of the Compensation, Talent and Culture Committee and the Nominating and Governance Committee. Defendant May received and continues to receive handsome compensation for his role as a Company director. He also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2023 LTIP.  Furthermore, he solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Casiano,

English, Farley, H. Ford, W. Ford, Helman, Kennard, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2024 Stock Plan. As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, under the 2024 Stock Plan, Defendant May is eligible to receive stock awards under the 2024 Stock Plan, has received various amounts of stock awards under the 2024 Stock Plan, and will receive various amounts of stock awards under the 2024 Stock Plan in the future, thereby materially benefiting from the adoption of the 2024 Stock Plan. For these reasons, too, Defendant May breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

215.    Additional reasons that demand on Defendant Mooney is futile to follow. Defendant Mooney has served as a Company director since 2019. She is also a member of the Audit Committee and the Nominating and Governance Committee. Defendant Mooney received and continues to receive handsome compensation for her role as a Company director. She also solicited the 2023 Proxy Statement, which

contained false and misleading statements and contributed to the re-election of Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg, and herself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2023 LTIP. Furthermore, she solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg, and herself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2024 Stock Plan. As a trusted-long time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, under the 2024 Stock Plan, Defendant Mooney is eligible to receive stock awards under the 2024 Stock Plan, has received various amounts of stock awards under the 2024 Stock Plan, and will receive various amounts of stock awards under the 2024 Stock Plan in the future, thereby materially benefiting from the adoption of the 2024 Stock Plan. For these reasons, too, Defendant Mooney breached her fiduciary duties, faces a substantial likelihood of

liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

216. Additional reasons that demand on Defendant Vojvodich Radakovich is futile to follow. Defendant Vojvodich Radakovich has served as a Company director since 2017. She is also the Chair of the Compensation, Talent and Culture Committee, as well as a member of the Nominating and Governance Committee and the Sustainability, Innovation and Policy Committee. Defendant Vojvodich Radakovich received and continues to receive handsome compensation for her role as a Company director. She also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Thornton, Veihmeyer, and Weinberg, and herself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2023 LTIP. Furthermore, she solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Thornton, Veihmeyer, and Weinberg, and herself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2024 Stock Plan. As a trusted-long time Company director, she conducted little, if any, oversight of the Company's

engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, under the 2024 Stock Plan, Defendant Vojvodich Radakovich is eligible to receive stock awards under the 2024 Stock Plan, has received various amounts of stock awards under the 2024 Stock Plan, and will receive various amounts of stock awards under the 2024 Stock Plan in the future, thereby materially benefiting from the adoption of the 2024 Stock Plan. For these reasons, too, Defendant Vojvodich Radakovich breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

217.    Additional reasons that demand on Defendant Thornton is futile to follow. Defendant Thornton has served as a Company director since 1996, and as Lead Independent Director since 2022. He is also a member of the Compensation, Talent and Culture Committee, Finance Committee, and the Nominating and Governance Committee. Defendant Thornton received and continues to receive handsome compensation for his role as a Company director. He also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Veihmeyer, and

Weinberg, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2023 LTIP. Furthermore, he solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Veihmeyer, and Weinberg, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2024 Stock Plan. As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, under the 2024 Stock Plan, Defendant Thornton is eligible to receive stock awards under the 2024 Stock Plan, has received various amounts of stock awards under the 2024 Stock Plan, and will receive various amounts of stock awards under the 2024 Stock Plan in the future, thereby materially benefiting from the adoption of the 2024 Stock Plan. For these reasons, too, Defendant Thornton breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

218.    Additional reasons that demand on Defendant Veihmeyer is futile to

follow. Defendant Veihmeyer has served as a Company director since 2017. He is also the Chair of the Audit Committee and a member of the Nominating and Governance Committee. Defendant Veihmeyer received and continues to receive handsome compensation for his role as a Company director. He also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, and Weinberg, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2023 LTIP. Furthermore, he solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, and Weinberg, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2024 Stock Plan. As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, under the 2024 Stock Plan, Defendant Veihmeyer is eligible to receive stock awards under the

2024 Stock Plan, has received various amounts of stock awards under the 2024 Stock

Plan, and will receive various amounts of stock awards under the 2024 Stock Plan

in the future, thereby materially benefiting from the adoption of the 2024 Stock Plan.

For these reasons, too, Defendant Veihmeyer breached his fiduciary duties, faces a

substantial likelihood of liability, is not independent or disinterested, and thus

demand upon him is futile and, therefore, excused.

219.   Additional reasons that demand on Defendant Weinberg is futile to

follow. Defendant Weinberg has served as a Company director since 2016. He is

also a member of the Compensation, Talent and Culture Committee, the Nominating

and Governance Committee, and the Sustainability, Innovation and Policy

Committee. Defendant Weinberg received and continues to receive handsome

compensation for his role as a Company director. He also solicited the 2023 Proxy

Statement, which contained false and misleading statements and contributed to the

re-election of Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman,

Kennard, May, Mooney, Vojvodich Radakovich, Thornton, and Veihmeyer, and

himself to the Board, which allowed them to continue to breach their fiduciary duties

to the Company and caused shareholders to approve the 2023 LTIP.  Furthermore,

he solicited the 2024 Proxy Statement, which contained false and misleading

statements and contributed to the re-election of Defendants Casiano, English, Farley,

H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich,

Thornton, and Veihmeyer, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2024 Stock Plan. As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, under the 2024 Stock Plan, Defendant Weinberg is eligible to receive stock awards under the 2024 Stock Plan, has received various amounts of stock awards under the 2024 Stock Plan, and will receive various amounts of stock awards under the 2024 Stock Plan in the future, thereby materially benefiting from the adoption of the 2024 Stock Plan. For these reasons, too, Defendant Weinberg breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

220.    Additional reasons that demand on the Board is futile follow.

221.    As mentioned above, Defendants English, H. Ford, and W. Ford are all members of the Ford family, related, and therefore beholden to each other. Moreover, as discussed in the 2023 and 2024 Proxy Statements, the Ford family holds Ford Class B stock that receives 36 votes per share to regular common stock shares' receiving a single vote per share. As such, the entire Board is beholden to

the Ford family as controlling shareholders, and the Director-Defendants would not be able to assess a demand with appropriate disinterestedness against them.

222.   Defendant Casiano, Mooney, and Veihmeyer (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct, Director Code of Ethics, and the Code of Ethics for Senior Financial Personnel. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

223.   In violation of the Code of Conduct, Director Code of Ethics, and the Code of Ethics for Senior Financial Personnel, the Director-Defendants engaged in or permitted the scheme to cause the Company to issue materially false and

misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Conduct, Director Code of Ethics, and the Code of Ethics for Senior Financial Personnel by failing to act with integrity, failing to avoid conflicts of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Conduct, Director Code of Ethics, and the Code of Ethics for Senior Financial Personnel and the law. Thus, the Director-Defendants breached the Company's own Code of Conduct, Director Code of Ethics, and the Code of Ethics for Senior Financial Personnel, are not disinterested, and demand is excused as to them.

224.   Ford has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for the wrongful conduct to attempt to recover for Ford any part of the damages Ford suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

225.   The Individual Defendants' conduct described herein and summarized

above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

226.   The acts complained of herein constitute violations of fiduciary duties owed by Ford's officers and directors, and these acts are incapable of ratification.

227.   The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Ford. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Ford, there

would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

228.  If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Ford to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

229.  Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least eight of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act

230.  Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

231.  Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities

exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

232.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

233.   Under the direction and watch of Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg, both the 2023 and 2024 Proxy Statements failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, Director Code of Ethics, and the Code of Ethics for Senior Financial Personnel, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2023 and 2024 Proxy Statements' descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately

exercising these functions and were causing or permitting the Company to issue false and misleading statements.

234.    The 2023 and 2024 Proxy Statements also failed to disclose that: (1) Ford's quality assurance procedures for its vehicles have been deficient since the start of the Relevant Period; (2) as such, Ford has begun to experience higher warranty costs; (3) because of this, the Company's warranty reserves are not an accurate predictor of quality issues in vehicles sold by the Company since the start of the Relevant Period; (4) the Company's profitability was therefore reasonably likely to suffer as a result; (5) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval the 2023 LTIP and the 2024 Stock Plan; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

235.    In exercise of reasonable care, Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 and 2024 Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on matters set forth for shareholder determination in the 2023 and 2024 Proxy Statements,

including but not limited to the re-elections of Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg to the Board, the approval of the 2023 LTIP, and the approval of the 2024 Stock Plan.

236. The false and misleading elements of the 2023 Proxy Statement led to, among other things, the re-election of Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg to the Board, which allowed them to continue to breach their fiduciary duties to the Company, and the approval of the 2023 LTIP.

237. The false and misleading elements of the 2024 Proxy Statement led to, among other things, the re-election of Defendants Casiano, English, Farley, H. Ford, W. Ford, Helman, Kennard, May, Mooney, Vojvodich Radakovich, Thornton, Veihmeyer, and Weinberg to the Board, which allowed them to continue to breach their fiduciary duties to the Company, and the approval of the 2024 Stock Plan.

238. The Company was damaged as a result of Defendants Casiano's, English's, Farley's, H. Ford's, W. Ford's, Helman's, Kennard's, May's, Mooney's, Vojvodich Radakovich's, Thornton's, Veihmeyer's, and Weinberg's material misrepresentations and omissions in the 2023 and 2024 Proxy Statements.

239. Plaintiff, on behalf of Ford, has no adequate remedy at law.

## SECOND CLAIM
**Against the Individual Defendants for Violations of Section 20(a) of the**

**Exchange Act**

240. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

241. The Individual Defendants, by virtue of their positions with Ford and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Ford and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of §20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Ford to engage in the illegal conduct and practices complained herein.

242. Plaintiff, on behalf of Ford, has no adequate remedy at law.

<u>**THIRD CLAIM**</u>
**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**

243. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

244. The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Ford. Not only is Ford now defending claims that is violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Ford by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants'

misconduct, the Individual Defendants caused the Company to repurchase **54,780,000** of its own shares at artificially inflated prices, damaging Ford.

245. During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in earnings calls, and periodic and current reports filed with the SEC.

246. The Individual Defendants employed devices, schemes, and artifices to defraud while in the possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Ford not misleading.

247. The Individual Defendants as top executives and directors acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings

from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

248.   By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

249.   Plaintiff, on behalf of Ford, has no adequate remedy at law.

## FOURTH CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

250.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

251.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Ford's business and affairs.

252.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

253.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Ford.

254.    In breach of their fiduciary duties owed to Ford, the Individual

Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) Ford's quality assurance procedures for its vehicles have been deficient since the start of the Relevant Period; (2) as such, Ford has begun to experience higher warranty costs; (3) because of this, the Company's warranty reserves are not an accurate predictor of quality issues in vehicles sold by the Company since the start of the Relevant Period; (4) the Company's profitability was therefore reasonably likely to suffer as a result; (5) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval the 2023 LTIP and the 2024 Stock Plan; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

255.   In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

256.   Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

257.   In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices before the fraud was exposed, while three of the Individual Defendants engaged in lucrative insider sales, netting proceeds of approximately $2.4 million.

258.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to issue materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

259.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

260.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Ford has sustained and continues to sustain significant

damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

261. Plaintiff, on behalf of Ford, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Unjust Enrichment

262. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

263. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Ford.

264. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Ford that was tied to the performance or artificially inflated valuation of Ford, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

265. Plaintiff, as a shareholder and representative of Ford, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary duties.

266. Plaintiff, on behalf of Ford, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Abuse of Control

267. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

268. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Ford, for which they are legally responsible.

269. As a direct and proximate result of the Individual Defendants' abuse of control, Ford has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

270. Plaintiff, on behalf of Ford, has no adequate remedy at law.

## SEVENTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

271. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

272. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Ford in a manner consistent with the operations of a publicly held corporation.

273.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Ford has sustained and will continue to sustain significant damages.

274.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

275.   Plaintiff, on behalf of Ford, has no adequate remedy at law.

## EIGHTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

276.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

277.   As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

278.   In addition, the Individual Defendants caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

279.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

280.   Plaintiff, on behalf of Ford, has no adequate remedy at law.

## NINTH CLAIM
**Against Defendants Farley and Lawler for Contribution Under Sections 10(b) and 21D of the Exchange Act**

281.   Plaintiff incorporates by reference and realleges each and every allegation set forth in above, as though fully set forth herein.

282.   Ford and Defendants Farley and Lawler are named as defendants in the Securities Class Action, which asserts claims under federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Farley's and Lawler's willful and/or reckless violations of their obligations as officers, directors, and/or former officers Ford.

283.   Defendants Farley and Lawler, because of their positions of control and authority as officers, directors, and/or former officers of Ford, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Ford, including the wrongful acts complained of herein and in the Securities Class Action.

284.   Accordingly, Defendants Farley and Lawler are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private

right of action for contribution arising out of violations of the Exchange Act.

285.   As such, Ford is entitled to receive all appropriate contribution or indemnification from Defendants Farley and Lawler.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of Ford, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Ford;

(c)   Determining and awarding to Ford the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)   Directing Ford and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Ford and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may

be necessary to ensure proper corporate governance policies:

       1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

       2. a provision to permit the shareholders of Ford to nominate at least six candidates for election to the Board;

       3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

       (e)    Awarding Ford restitution from the Individual Defendants, and each of them;

       (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

       (g)    Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: September 20, 2024

       Respectfully submitted,

       **THE BROWN LAW FIRM, P.C.**

       */s/ Timothy Brown*

Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Tel: (516) 922-5427
Fax: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*